CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
10/3/2025
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
    DEPUTY CLERK

## UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF VIRGINIA CHARLOTTESVILLE DIVISION

| | |
|---|---|
| LINDA SCHUMANN, ADMINISTRATOR OF THE ESTATE OF THOMAS JOHN SCHUMANN, DECEASED; CARRIE FINCH-SMITH, ADMINISTRATOR OF THE ESTATE OF JAMES GORDON SMITH, DECEASED; DR. JEFFREY S. YOUNG, DR. KENAN W. YOUNT, DR. MARK E. ROESER, and DR. JOHN A. KERN, *Plaintiffs,* | CIVIL ACTION NO. 3:25cv00083 |
| v. | |
| K. CRAIG KENT, MELINA KIBBE, WENDY HORTON, ALLAN TSUNG, OURANIA PREVENTZA, KIM DE LA CRUZ, THE RECTOR AND VISITORS OF THE UNIVERSITY OF VIRGINIA, UNIVERSITY OF VIRGINIA PHYSICIANS GROUP, and THE COMMONWEALTH OF VIRGINIA, *Defendants.* | |

## PLAINTIFFS' COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

Plaintiffs, Linda Schumann, Administrator of the Estate of Thomas John Schumann; and Carrie Finch-Smith, Administrator of the Estate of James Gordon Smith (together, the "Widowed Spouse Plaintiffs"), and Dr. Jeffrey S. Young, Dr. Kenan W. Yount, Dr. Mark E. Roeser, and Dr. John A. Kern (together, the "Physician Plaintiffs," together with the Widowed Spouse Plaintiffs, "Plaintiffs"), by and through undersigned counsel, hereby file this Complaint against Dr. K. Craig Kent ("KENT"); Dr. Melina Kibbe ("KIBBE"); Wendy Horton ("HORTON"); Dr. Allan Tsung

("TSUNG"); Dr. Ourania Preventza ("PREVENTZA"); Dr. Kim de la Cruz ("DE LA CRUZ"); the Rector and Visitors of the University of Virginia (the "BOV"), the corporate entity under which the institution the University of Virginia ("UVA")—including the School of Medicine ("UVASOM"), the Health System ("UVAHS"), and the Medical Center ("UVAMC")—does business (The BOV, collectively with the UVA, UVAHS, UVAMC, UVASOM, the "UVA Affiliates"); University of Virginia Physicians Group ("UPG," together with the UVA Affiliates, the "Entity Defendants"); and the Commonwealth of Virginia ("Virginia," together with the Entity Defendants, the individual executives and physicians defendants, "Defendants"), and state as follows:

<u>**OVERVIEW**</u>

1.    This case arises out of a hostile takeover of a revered medical system by a cadre of individuals determined to maximize revenues and rankings, thereby inflating their own career prospects and financial gain, through concerted, repeated, and consistent illegal acts. KENT, KIBBE, HORTON, TSUNG, PREVENTZA, DE LA CRUZ, and other unnamed co-conspirators (collectively, the "Kent Enterprise") orchestrated a scheme that functioned with fraudulent and unlawful predicate acts, including fraudulent billing practices and falsification of medical records, at its operative core. Through this conduct, the Kent Enterprise illicitly caused the deaths of two patients, here represented by their widowed spouses, who underwent surgery and died thereby at UVA; generated excess revenue; consolidated authority; and retaliated against dissent. These acts included, without limitation: (a) mail fraud in violation of 18 U.S.C. § 1341; (b) wire fraud in violation of 18 U.S.C. § 1343; (c) healthcare/Medicare fraud in violation of 18 U.S.C. § 1347; (d) extortion in violation of Va. Code § § 18.2-59 and 18.2-26(3); and (e) obstruction of justice and witness tampering in violation of 18 U.S.C. § 1512(b)–(d). These predicate acts were repeated,

related, and continuous, forming a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

2.      In 1782, Thomas Jefferson cautioned Virginians about the dangers of complacency in the face of corruption. He warned: *"The time to guard against corruption and tyranny, is before they shall have gotten hold on us. It is better to keep the wolf out of the fold, than to trust to drawing his teeth and talons after he shall have entered."*[1] Jefferson's words presciently framed a philosophy of governance and became a guiding principle of the University he founded in 1819: that institutions, like individuals, must guard vigilantly against corruption, tyranny, and dishonor.

3.      UVA and the UVA Affiliates long embodied those Jeffersonian values. The mission of UVA affirms this: *"to serve the Commonwealth of Virginia, the nation, and the world by developing responsible citizen-leaders and professionals; advancing, preserving, and disseminating knowledge; and providing world-class patient care."*[2] These ideals of honesty, integrity, freedom of thought, and patient-centered care are the foundation on which UVA built its reputation. But these values were put to the test in 2019, when UVAHS began struggling: its earnings lagged behind budget and its CEO had just departed in the wake of a billing scandal. In February 2020, the BOV and UVA's then president, Jim Ryan, failed to heed Jefferson's warning by installing KENT as Executive Vice President for Health Affairs at UVA and Chief Executive Officer of UVAHS. With full knowledge of KENT's controversial reputation, including faculty votes of no confidence at Ohio State University, they opened the gates to the very wolf Jefferson had cautioned against.

4.      Within weeks of his arrival, KENT declared his mission to maximize revenue and national rankings, even if it meant dismantling patient-safety safeguards and removing

---

[1] *Notes on the State of Virginia* (1782). https://tjrs.monticello.org/letter/2544 (last accessed 9/12/2025).
[2] https://faculty-handbook.provost.virginia.edu/mission-statement-university-virginia (last accessed 9/12/2025).

experienced clinicians who opposed his strategy. He installed HORTON, his long-time subordinate at Ohio State University and the University of Wisconsin — whom, upon information and belief, he privately described as his "secret weapon" — as Chief Operating Officer of UVAMC in direct violation of the UVA Affiliates' interviewing and hiring policies and processes, exemptions to those processes, and state and federal regulations governing the hiring of protected classes. Just four months after her hire as COO, with no search whatsoever, whether internal or external, HORTON was elevated to the role of permanent Chief Executive Officer of UVAMC by KENT, where she reigned over two billion dollars of yearly revenue, despite not being the most qualified candidate for the position.

5.    KENT arrived at UVA just before the COVID pandemic. Just after he started, he left for a vacation with his family to the Caribbean for two weeks. When he returned, and once there were finally limited tests for COVID available, KENT dictated that his family and close friends be tested routinely for the virus, coupling the results of the testing with fake medical records so as to hide the identity of those being tested, and, instead of using the limited tests on staff and physicians who were still treating patients through COVID and the patients who were arriving at the hospital with COVID-type symptoms, KENT prioritized testing on the University's football players.

6.    Almost immediately upon KENT's arrival at the UVA Affiliates at the beginning of the COVID pandemic, KENT decided to continue performing elective surgeries (the moneymaker for the hospital), accept all transfers into the hospital regardless of the danger to hospital staff, and track down and fire any doctor who did not comply with transfer requests. When the Communications Chief and the Chief Medical Officer—two high-profile, seasoned executives— voiced their disagreement with KENT over his radical decisions, which they said were solely

financially motivated, KENT fired them without following any of the typical Human Resources steps. Another very high-profile UPG executive who had disagreements with KENT was effectively demoted when he was forced to choose between the good of his department and remaining in executive leadership. This doctor chose the good of his department and left leadership. One year later, that doctor's replacement at UPG was effectively forced to leave his job at the UVA Affiliates when KIBBE threatened his position as Department Chair if he were to resist the Kent Enterprise's designs for UPG—threats that were revealed directly to President Jim Ryan and Provost Ian Baucom. These retaliatory firings and constructive discharges led everyone in leadership to understand that if you disagreed with KENT, you would be fired.

7.      The decision to accept all transfers into the hospital at the beginning of the COVID pandemic not only endangered the lives of the doctors and staff who did not have the appropriate personal protective equipment to care for patients suffering from COVID, but also endangered the lives of the patients who were often left in the emergency room for hours to wait for a bed in the hospital to open up. At times, as many as 40 people boarded in the emergency room, all in the interest of accepting all patients possible and performing as many surgeries on them as possible to maximize revenues. Upon information and belief, the Kent Enterprise falsely reported the open bed count in the hospital so that a room would be available in case an elective surgery appeared, exacerbating the over-occupation of the emergency room.

8.      When the governor of Virginia banned elective surgeries during the pandemic, KENT was palpably angry.

9.      At the same time that KENT made the decision to accept all transfers into the hospital, he also laid off and furloughed staff and was overly aggressive in directing pay cuts to doctors and staff, further endangering medical providers and patients. When patient volume

ultimately started to pick back up, the hospital was overrun without the staff KENT had let go, and had to hire "traveling" doctors and nurses who were more expensive and did not know the systems, further endangering lives.

10.    In July 2021, KENT appointed KIBBE, his former research colleague and collaborator and sponsor for his induction into the National Academy of Medicine as Dean of UVASOM, despite, upon information and belief, the non-renewal of her position as Chair of the Department of Surgery at the University of North Carolina. KIBBE was quoted in a New York Times investigation into failed pediatric heart surgeries at UNC, acknowledging that, like what was to come at UVA, despite questions about pediatric heart surgery results there, the hospital "had never restricted surgeries." *Exhibit 1*.

11.    These appointments of HORTON and KIBBE, made without the usual and long-established policies and procedures such as faculty input and competitive search processes, signaled that Kent and his acolytes were making a radical break from UVA's traditions of collaborative governance and patient-first leadership.

12.    As time passed, the Kent Enterprise was emboldened to deliberately continue to fire the old guard and hire co-conspirator physicians with pre-ordained search processes, including TSUNG, PREVENTZA, and DE LA CRUZ. These three doctors extended the reach of the Kent Enterprise, now cemented behind the gates of UVA.

13.    Interim leaders quickly recognized the dangers, which were reported to leadership immediately and consistently over the next four years. By ninety days into KENT's tenure, UVA's leadership was fully aware that the Kent Enterprise was undermining patient safety, subverting institutional norms, and deploying unlawful practices. The Kent Enterprise leadership did nothing to rectify the adverse effects of the predicate acts of the Kent Enterprise and its scheme. It was

only after an independent, outside investigation into a September 5, 2024 letter of no confidence in KENT and KIBBE, signed off by at least 128 physicians and staff at the UVA Affiliates, that things began to change for the better with the resignations of many members of the Kent Enterprise in 2025.

14.     Throughout the Kent Enterprise's tenure, leadership was being warned. In April 2020, not even two months into KENT's employment, Dr. Chris Ghaemmaghami, then Interim CEO of UVAMC, wrote directly to President Ryan, warning that KENT was consolidating power, dismantling long-standing safeguards, and creating a culture of fear, intimidation, and retaliation. His letter is attached hereto as *Exhibit 2*.

15.     In September 2021, the Chairperson of UPG weighed in with a letter of no confidence in KENT to UVA's President Jim Ryan and then-Rector Whit Clement, attached hereto as *Exhibit 3*, that outlined complaints similar to those of Dr. Ghaemmaghami, which she fleshed out in a face-to-face meeting with Ryan and Clement on October 7, 2021. After their meeting, the Chairperson wrote a follow-up note "to emphasize a couple of points and provide some context" to her complaints about KENT. *Exhibit 4*.

16.     Throughout 2021 and 2022, the Kent Enterprise continued to dictate policy and procedure changes at the Entity Defendants designed to maximize revenues, without explanation or faculty input. Policy changes often negatively impacted patient safety.

17.     In an effort to maximize income by saving money at patients' expense, for example, beginning in late 2020, the Kent Enterprise replaced long-standing expert triage staff in the Department of Ophthalmology with centralized telephone operators who responded to emergency and commonplace calls equally and across all departments. This change caused a monocular patient needing urgent evaluation to be scheduled for an appointment two months out, resulting in

the patient going blind. When the presiding ophthalmologist reported the mishandling of the calls to HORTON in 2021,[3] he was rewarded with a note in his Human Resources file warning of suspension, a thinly veiled tactic calculated to intimidate him, suppress dissent, and force silence so that the misconduct would not be reported to hospital leadership, licensing boards, or law enforcement.

18.    At the same time broad policy and procedure changes were being dictated in the interest of maximizing profits and increasing rankings, and with the result that patients' safety was being placed at risk, the Kent Enterprise was getting rid of those physicians and staff who spoke out against change and replacing them with "yes people." Defendants TSUNG, PREVENTZA, and DE LA CRUZ were such hires.

19.    Meanwhile, UVA's medical residents were forced to witness these developments from the periphery. Preventza's conduct in the operating room and in her treatment of trainees had left several residents traumatized, and many more were openly questioning how the escalating turmoil within UVAHS would affect their professional futures. Because of the pervasive culture of fear and retaliation established by KENT's leadership team, residents did not believe they could safely raise concerns through ordinary reporting channels. Instead, they sought recourse through the Graduate Medical Education Committee ("GMEC").

20.    Residents reported that PREVENTZA's conduct in the operating room raised serious patient-safety concerns. They specifically reported that PREVENTZA demonstrated a lack of basic preparation, including an inability to use standard surgical instruments available in UVAMC's operating rooms. The residents also reported that on more than one occasion PREVENTZA refused to perform emergency procedures because her preferred instruments were

---

[3] *See* email exchange between the ophthalmologist at issue and HORTON, attached hereto as *Exhibit 5*.

not present, forcing other attending surgeons to operate even if they were ill or exhausted. Residents further described her as chaotic, slow, and unable to formulate surgical plans during complex procedures, often relying on trainees or other surgeons to direct her actions. They detailed how PREVENTZA regularly pressured residents to perform steps of operations they had not yet been trained to do by qualified attending surgeons. PREVENTZA's behavior toward residents went beyond mere unprofessionalism. She publicly disparaged residents during morbidity and mortality conferences and sought to upend UVAMC's longstanding educational model by diminishing residents' hands-on operative training. She pressured them to falsify patient records to cover her complications. Collectively, these reports from residents painted a picture of a surgeon fundamentally unfit to train residents and unable to provide safe care to patients.

21.    The reports prompted GMEC to initiate an independent investigation into Preventza's treatment of residents. Kent and his cronies, however, refused to acknowledge the seriousness of the findings, dismissing them as exaggerated or overblown. TSUNG attempted to tamper with the findings of the investigation. Upon information and belief, KIBBE and HORTON engaged in obstruction and witness tampering by intimidating the Designated Institutional Officer when they discovered the GMEC report had been shared with members of the BOV and Health System Board without their knowledge.

22.    In August of 2024, the warnings regarding the Kent Enterprise continued. A long-standing UVA physician wrote to the then-Provost, Ian Baucom, with complaints about leadership. "Our current senior leadership at the Health System level is the worst I have been associated with . . . This is a closed, secretive, top-down group who manage by fiat, threat, intimidation, random and punitive demotions and firings, and suppression or delay of release of information or

circumstances they deem unfavorable . . . it seems that there has been an inexorable decline in quality, patient, and faculty/staff satisfaction." *Exhibit 6.*

23.     By September 2024, 128 UVA physicians had signed a Letter of No Confidence in KENT and KIBBE, attached hereto as *Exhibit 7*, which outlined "egregious acts, which must no longer be tolerated," including sections titled Compromised Patient Safety, Culture of Fear and Retaliation, Devaluing the Academic Standards of Promotions and Tenure, Excessive Spending on C-Suite Executives and Support, Failure to be Forthcoming on Significant Financial Matters, Consistently Violating the Board of Visitors Approved Code of Ethics in the University of Virginia Faculty Handbook, Weaponizing ASPIRE VALUES, and Subjecting Residents to Bullying and Harassment. Instead of engaging with these concerns, President Ryan publicly disparaged the signatories as a small, disgruntled minority, further entrenching the culture of fear and retaliation.

24.     Following the negative reaction of President Ryan to the Letter of No Confidence, on September 12, 2024, the Executive Committee of the *American Association of University Professors – UVA* responded with a Statement in Support of the physicians who signed the No Confidence Letter, attached hereto as *Exhibit 8*. In it, the Executive Committee wrote: "The reports of explicit and implicit threats and retaliation, public ridicule and humiliation, delays and denials of promotion and tenure for those identified as noncompliant to leadership interests, the elevation of rankings over sound practice, all run counter to good practice of shared governance, academic freedom and free speech recommended by the AAUP."

25.     The BOV eventually retained Williams & Connolly LLP to conduct an independent, outside investigation into the allegations raised in the Letter of no Confidence. Upon information and belief, more than 100 physicians were interviewed and corroborated the same patterns. While the investigation was pending, additional patient injuries, including deaths, occurred in November

2024 as a direct result of the Enterprise's policies and hiring and privileging of dangerously incompetent co-conspirator physicians.

26.     Also in November 2024, the GMEC reopened its investigation into PREVENTZA based on additional resident complaints since its initial investigation in May 2024 that the Kent Enterprise had dismissed. Investigation into these new complaints produced findings of such gravity that Preventza was immediately barred from having any further contact with residents at UVAMC.

27.     In February 2025, reports from Williams & Connolly and counsel for the physicians were delivered to the BOV, and KENT immediately resigned. KIBBE and HORTON resigned in the months that followed.

28.     The Kent Enterprise engaged in what amounted to a hostile takeover of UVA's medical institutions. They swept aside long-serving leaders, silenced dissenters, and installed loyalists in key roles to clear the way for their profit-driven scheme.

29.     Upon information and belief, during KENT's tenure, the Kent Enterprise hired approximately 550 faculty members and replaced or appointed approximately 16 of 21 Clinical Department Chairs at UVASOM, almost all of whom were selected outside of traditional governance protocols and long-established policies and procedures. These appointments were based on loyalty to KENT and the Enterprise rather than competence, merit, or in the interest of patient care, and served to entrench the Enterprise's control over the UVA Affiliates.

30.     Central to the Kent Enterprise's scheme were acts of witness tampering and obstruction directed at the Physician Plaintiffs Dr. Jeffrey S. Young, Dr. Kenan W. Yount, Dr. Mark E. Roeser, Dr. John A. Kern, and other unnamed physicians. In furtherance of the Kent Enterprise, Defendants knowingly used intimidation, threats, corrupt persuasion, misleading conduct, and

harassment against the Physician Plaintiffs, intending to: (a) attempt to extort them, through various means, into supporting and furthering the illegal acts of the Kent Enterprise; (b) influence, delay, or prevent their testimony in official proceedings; (c) cause them to withhold records or information; (d) impair the integrity and availability of evidence; and (e) hinder, delay, and prevent their communications with law enforcement and regulatory authorities regarding billing fraud, patient safety violations, and retaliatory conduct.

31.    Each Physician Plaintiff was targeted through calculated acts of obstruction, witness tampering, extortion, and retaliation. Dr. Young was removed from his longstanding roles as Division Chief of Acute Care Surgery and Trauma Director and forced from UVA after thirty years of service. Dr. Yount was denied promotion, stripped of his clinical titles, bypassed for clinical scheduling in favor of new hires of the Kent Enterprise, and replaced by unqualified loyalists after refusing to falsify operative reports at PREVENTZA's direction, ultimately leaving him no choice but to seek employment elsewhere.[4] Dr. Roeser was denied promotion, subjected to false "Be Safe" reports, forced to abandon federally funded research, and driven from Charlottesville with his family. Dr. Kern was removed as Co-Director of the Heart and Vascular Service Line, stripped of some of his administrative and leadership responsibilities, excluded from some of the decision-making, bypassed for clinical scheduling, and targeted after exposing fraudulent medical modifier code -62/-82 billing schemes.

32.    Beyond the harms to these Physician Plaintiffs, the Kent Enterprise's actions caused systemic patient safety failures and preventable deaths, two of which are made the subject of this

---

[4] Dr. Yount was not the only doctor PREVENTZA directed to falsify operative reports. *See* email to Compliance attached hereto as *Exhibit 9*, which outlines another surgeon's concerns regarding PREVENTZA asking "to be listed as an assistant surgeon in the operative notes despite not materially assisting in the procedures." His several concerns with this behavior by PREVENTZA are described in the email to Compliance and fall under the categories of "Inaccurate Documentation", "HIPAA Compliance", and "Ethical and Professional Conduct."

Complaint, represented herein by the Widowed Spouse Plaintiffs, which the Enterprise then committed fraud to try to cover up. This was the foreseeable result of the Kent Enterprise's deliberate hiring of known incompetent co-conspirator physicians (e.g., without limitation, TSUNG, PREVENTZA and DE LA CRUZ) to continue and extend the reach of the Kent Enterprise's racketeering activities and conspiracy to carry out same. As set forth herein, from 2020 through September 2024, multiple physicians raised alarms with UVA and UVA Affiliate leadership that the Kent Enterprise was acting illegally, ignoring safety policies, and endangering patients. Rather than respond, UVA's leadership defended and endorsed the Enterprise's strategy.

33.    Due to the resident's warnings, UVA's accreditation committee learned of the GMEC's findings and opened its own inquiry, this time extending its review to include both PREVENTZA and DE LA CRUZ. Before that investigation could be completed, two patients, James Gordon Smith and Thomas John Schumann, were admitted to UVAMC for what should have been routine heart procedures and/or surgeries. Both men were in otherwise good health, both had favorable prognoses, and both selected UVA because of its reputation as one of the nation's leading centers for cardiac surgery.

34.    Smith's April 19, 2024 surgery was performed by PREVENTZA. Schumann's November 18, 2024 surgery was performed by DE LA CRUZ. In each case, the named defendants altered and falsified medical records in an effort to (1) limit their own exposure to malpractice liability, (2) limit other named defendants' exposure to malpractice liability, and (3) thereby further the ends of the Kent Enterprise. These patient deaths were direct and predictable consequences of UVAHS's decision to entrust complex, life-saving procedures to unqualified surgeons whose

loyalty to KENT and willingness to participate in fraudulent billing schemes was valued above patient safety.

35.    Before the accreditation committee could release its final findings, UVASOM abruptly removed both PREVENTZA and DE LA CRUZ from surgical duties. PREVENTZA was quietly offered a severance package, and as she departed UVA, Kent's leadership team issued a public statement praising her "strong commitment to her patients and colleagues," thereby concealing from the public the true reasons for her removal and minimizing the risks she had created for both patients and residents.

36.    UVA's *own physicians*—both named Plaintiffs in this action and others not yet named—have explicitly stated that KENT and the Kent Enterprise are directly responsible for the deaths of patients James Gordon Smith and Thomas John Schumann. These physicians warned UVA leadership that PREVENTZA and DE LA CRUZ were unqualified and unfit to perform the complex surgeries they were assigned, yet their warnings were disregarded. The Physician Plaintiffs' testimony confirms that the deaths of Smith and Schumann were not isolated malpractice events, but the direct and foreseeable result of the Enterprise's racketeering conduct—fraudulent credentialing, obstruction, witness tampering, and the installation of incompetent loyalists to further its unlawful scheme.

37.    Moreover, in the wake of these patients' deaths, both PREVENTZA and DE LA CRUZ falsified patient records in an effort to minimize potential civil liability for themselves, UVA, the BOV, and other named defendants. These false representations by PREVENTZA and DE LA CRUZ were calculated to minimize financial loss and preserve the Kent Enterprise's and

UVA's financial gains, which the defendants had worked to increase by the wide-spread implementation of false billing practices described elsewhere in this pleading.

38.    Plaintiffs bring this action to redress the unlawful conduct of the Kent Enterprise and the deliberate indifference of UVA's leadership, and because they **continue** to deny the reality of their wrongdoing. Plaintiffs seek damages and injunctive relief under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq., including violations of 18 U.S.C. § 1962(c) and conspiracy to violate the Act under 18 U.S.C. § 1962(d). Plaintiffs also bring claims under the False Claims Act, 31 U.S.C. § 3730(h); Virginia's Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 et seq.; Virginia's Fraud and Abuse Whistleblower Protection Act, Va. Code § 2.2-3011; for negligent hiring and retention; and defamation.

39.    Defendants, blinded by ambition and power, supplanted UVA's traditions of honor, honesty, freedom of thought, and patient-centered care with a scheme rooted in illegality, fraud, intimidation, and retaliation. In doing so, they inflicted lasting harm on Plaintiffs, on UVA's patients, and on the reputation of one of America's most storied public institutions. Jefferson's admonition to guard against corruption before the wolf enters the fold went unheeded, and this action seeks to hold Defendants accountable for the very betrayal of trust he warned against.

## NATURE OF ACTION

40.    This is an action brought by the Widowed Spouse Plaintiffs, Linda Schumann, Administrator of the Estate of Thomas John Schumann, deceased; Carrie Finch-Smith, Administrator of the Estate of James Gordon Smith, deceased; and the Physician Plaintiffs Dr. Jeffrey S. Young, Dr. Kenan W. Yount, Dr. Mark E. Roeser, and Dr. John A. Kern to address claims arising out of a continuing scheme devised by KENT and KIBBE, along with HORTON, TSUNG, PREVENTZA, DE LA CRUZ and their unnamed co-conspirators (the "Kent Enterprise") to defraud the federal government, the Commonwealth of Virginia, and private health insurance

companies. The scheme was designed to increase UVAHS revenues and inflate its U.S. News & World Report rankings to the detriment of patient safety and legal compliance, while simultaneously enriching KENT, his enterprise, and his co-conspirators through higher compensation, enhanced prestige, and career advancement tied to those manipulated outcomes. The scheme included a conspiracy to commit those fraudulent acts. This scheme and the conspiracy to commit fraud involved repeated predicate acts of fraud and extortion, conducted via mail and wire.

41.    KENT, KIBBE, HORTON, TSUNG, PREVENTZA, DE LA CRUZ and others who remain unnamed herein associated to form an "enterprise" as defined in 18 U.S.C. § 1961(4) which was engaged in interstate commerce. The activities of the Kent Enterprise directly affected interstate commerce.

42.    In order to execute the scheme, it was necessary that the Kent Enterprise conspire to extort physicians into complying with and participating in the conspiracy, and to remove physicians and staff who did not agree to the conspiracy and replace them with minions who would go along with the Kent Enterprise's scheme.

43.    One way that the Kent Enterprise removed and replaced physicians and staff was by retaliating against physicians and staff at the Entity Defendants who spoke out against the scheme through a campaign of intimidation, threats, harassment, and corrupt persuasion. In turn, the Physician Plaintiffs suffered injury to their business or property at the hands of the Kent Enterprise.

44.    Another ploy used by the Kent Enterprise to dictate who would and who would not work and/or advance at the Entity Defendants was through use of the "Be Safe" reporting system— originally designed to improve systems and patient outcomes—to instead target whistleblowers.

16

False reports were filed strategically to create a pretext for administrative discipline and to prevent the promotion of whistleblowers and others the Kent Enterprise wished to remove from the Entity Defendants.

45.    Similarly, the ASPIRE values of Accountability, Stewardship, Professionalism, Integrity, Respect, and Equity, (by their very name, *aspirational*), were not designed to be used as weapons to create a pretext for administrative discipline and to prevent the promotion of whistleblowers and others the Kent Enterprise wished to remove from the Entity Defendants, but that is exactly how they were used.

46.    The retaliatory actions taken against the Physician Plaintiffs in furtherance of the Kent Enterprise, also constituted knowing violations of 18 U.S.C. § 1512(b)–(d). Specifically, leadership of the Entity Defendants, including KENT, KIBBE, HORTON, TSUNG, PREVENTZA, and DE LA CRUZ, knowingly used intimidation, threats, and corrupt persuasion against the Physician Plaintiffs, and engaged in misleading conduct toward them, with the intent to influence, delay, and prevent their testimony in official proceedings, to cause them to withhold documents and information, and to hinder, delay, and prevent their communications with law enforcement and regulatory authorities concerning the Kent Enterprise's fraudulent billing practices and patient safety violations. These acts were not legitimate administrative decisions but calculated steps to tamper with witnesses, alter and conceal evidence, and obstruct official proceedings. Acting in concert, the leadership of the Entity Defendants thereby intentionally harassed and retaliated against the Physician Plaintiffs to dissuade them from attending or testifying in proceedings, from reporting criminal conduct, and from assisting in enforcement actions. Through this campaign of intimidation, threats, harassment, and corrupt persuasion, the Kent Enterprise not only inflicted severe injury on each the Physician Plaintiff's business, property,

and professional reputation, but also obstructed justice in furtherance of its scheme to defraud the federal government and the Commonwealth of Virginia.

47.    The predicate acts described herein constitute a pattern of racketeering activity, as they were related to one another and amounted to, or posed a threat of, continued criminal activity carried out through the Kent Enterprise.

48.    The retaliatory actions taken against Dr. Young, in furtherance of the Kent Enterprise, included, without limitation, removing him from his role as Division Chief of Acute Care Surgery, stripping him of his longstanding position as Director of the Trauma Center, reducing his compensation, and installing less-qualified individuals in his place despite his decades of nationally-recognized leadership in trauma surgery. These measures were not legitimate personnel decisions but calculated acts by leadership of the Entity Defendants, including KENT, KIBBE, HORTON, TSUNG, PREVENTZA, and DE LA CRUZ, to intimidate and corruptly persuade Dr. Young, to silence him, and to hinder, delay, and prevent his communications with law enforcement, regulators, and oversight bodies after he spoke out about unlawful activities being undertaken at the behest of the Kent Enterprise. Acting in concert, they engaged in witness tampering and obstruction in violation of 18 U.S.C. § 1512(b)–(d), stripping Dr. Young of his authority, damaging his professional standing, and rendering his continued employment untenable. Through this campaign of retaliation, witness tampering, and obstruction, the Entity Defendants' leadership not only pressured Dr. Young to leave but effectively removed him from his position and forced him out of the institution.

49.    The silencing campaign and retaliatory actions taken against Dr. Yount, in furtherance of the Kent Enterprise, included, without limitation, refusing to promote him from Assistant to Associate Professor in the normal course of his employment based on unfounded

allegations, stripping him of his clinical job titles by means of the hiring of a physician who should have been known to be unqualified by the Entity Defendants' leadership and appointing that physician co-director within Dr. Yount's specialty, denying Dr. Yount due process in meetings with the Entity Defendants' leadership, and bypassing him for clinical scheduling, all of which inflicted severe financial, emotional, and reputational harm to Dr. Yount as well as foreseeable harm to patients caused by exposure to incompetent surgeons favored by the Kent Enterprise. These measures were not legitimate personnel decisions but calculated acts by leadership of the Entity Defendants, including KENT, KIBBE, HORTON, TSUNG, PREVENTZA, and DE LA CRUZ, to intimidate and corruptly persuade Dr. Yount, to silence him, and to hinder, delay, and prevent his communications with law enforcement, regulators, and oversight bodies after he spoke out about unlawful activities being undertaken at the behest of the Kent Enterprise. Acting in concert, they engaged in witness tampering and obstruction in violation of 18 U.S.C. § 1512(b)–(d), stripping Dr. Yount of his authority, damaging his professional standing, and rendering his continued employment untenable. Through this campaign of retaliation, witness tampering, and obstruction, the Entity Defendants' leadership not only pressured Dr. Yount to leave but effectively removed him from his position and forced him out of the institution. These acts caused severe emotional distress while he was employed by the Entity Defendants as well as at the time of his constructive discharge, when Dr. Yount and his family were forced to move out of Charlottesville to a new job and new schools in a new city. Dr. Yount's departure also caused damage to Defendants, the city of Charlottesville, and the whole region reached by the UVA Affiliates as they lost one of their most talented and prolific heart surgeons.

50.     The retaliatory actions taken against Dr. Roeser in furtherance of the Kent Enterprise, included, without limitation, denying him tenure based on unfounded allegations,

forcing him to delay his tenure application, compelling him to attend unnecessary therapy sessions, filing and tolerating false "Be Safe" reports against him, and creating intolerable working conditions through the continued use of unsafe operating rooms despite his repeated warnings. These measures were not legitimate personnel decisions but calculated acts by the Entity Defendants' leadership, including TSUNG and PREVENTZA, to intimidate and corruptly persuade Dr. Roeser, to silence him, and to hinder, delay, and prevent his communications with law enforcement, regulators, and oversight bodies after he reported patient safety violations, hazardous operating room conditions, and fraudulent billing practices. Acting in concert, they engaged in witness tampering and obstruction in violation of 18 U.S.C. § 1512(b)–(d), marginalizing Dr. Roeser, undermining his authority, and dismantling his professional role in order to protect the Kent Enterprise. Through this targeted campaign of retaliation, witness tampering, and obstruction, Entity Defendants' leadership inflicted severe reputational harm on Dr. Roeser, deprived him of future career opportunities, forced the abandonment of his nationally funded research and leadership roles, and caused substantial emotional distress, effectively forcing Dr. Roeser out of the institution and Charlottesville, including having to sell his dream home and move himself and his family to a new job in a new city, derailing his career, and depriving Defendants and the region of one of its most accomplished pediatric and cardiothoracic surgeons.

51.    The retaliatory actions taken against Dr. Kern, in furtherance of the Kent Enterprise, included, without limitation, removing him from his role as Co-Director of the Heart and Vascular Service Line, stripping him of some of his administrative and leadership responsibilities, excluding him from some of the decision-making, and bypassing him for clinical scheduling in favor of PREVENTZA and DE LA CRUZ, all of which resulted in significant loss of earnings for Dr. Kern as well as foreseeable harm to patients caused by exposure to at least two incompetent cardiac

surgeons. These measures were not legitimate personnel decisions but calculated acts by Entity Defendants' leadership, including KENT, KIBBE, HORTON, TSUNG, PREVENTZA, and DE LA CRUZ to intimidate and corruptly persuade Dr. Kern, to silence him and to hinder, delay, and prevent his communications with law enforcement, regulators, and oversight bodies after he exposed and opposed their fraudulent use of modifiers -62[5] and -82[6] to bill for co- and assistant surgeons when no such assistance was medically necessary. Acting in concert, they engaged in witness tampering and obstruction in violation of 18 U.S.C. § 1512(b)–(d), marginalizing Dr. Kern, compromising his authority, and weakening his professional role in order to protect the Kent Enterprise. Through this targeted campaign of retaliation, witness tampering, and obstruction, the Entity Defendants' leadership inflicted severe financial, emotional and reputational harm on Dr. Kern.

52.     Besides the harms inflicted upon the Physician Plaintiffs, the named defendants also caused the deaths of Thomas John Schumann and James Gordon Smith. KENT and his subordinates insisted upon hiring physicians who were willing to engage in fraud rather than physicians who were competent. PREVENTZA, and subsequently DE LA CRUZ, were hired on at UVA to be members of the Kent Enterprise as co-conspirators and fellow racketeers. The defendants had <u>actual</u> knowledge at the time of the hiring of both PREVENTZA and DE LA CRUZ that they were not competent surgeons and administrators, and continued to retain them after obtaining still further <u>actual</u> knowledge regarding their dangerous incompetency as well as their proclivity for committing fraudulent and unlawful actions as described herein.  These hiring

---

[5] Medical modifier 62 allows billing for two co-surgeons, typically from different specialties, who are both required to perform a single procedure on the same patient during the same operative session.

[6] Medical modifier 82 allows billing for non-resident physicians who assist during an operation in a teaching hospital setting because a resident is not "qualified," meaning the resident was either not present or lacked the necessary skills for the particular surgery.

decisions, made only to serve the Enterprise's ends, placed Thomas Schumann and James Smith directly in harm's way. Worse, in the aftermath of their own malpractice, PREVENTZA and DE LA CRUZ falsified and/or fraudulently altered medical records for their own benefit and the benefit of the Enterprise. This fraudulent activity was conducted over wire and mail.

53. The Widowed Spouse Plaintiffs now bring this action to recover damages to their businesses and properties resulting from the Kent Enterprise and its racket. These damages include, but are not limited to, the decedents' lost wages and services, the Widowed Spouses' lost wages, money expended on fraudulent medical bills, and the loss of other legal remedies caused by the defendant's falsification of medical records.

54. All Plaintiffs have suffered injury to their business and property, including but not limited to unnecessary doctor and hospital bills, lost wages, loss of employment, loss of earnings, loss of professional opportunities, reputational harm, and out-of-pocket expenses, all of which constitute cognizable injuries under 18 U.S.C. § 1964(c).

55. As a result of this malicious and unlawful conduct, Plaintiffs bring this action for damages and injunctive relief pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq., including conspiring to violate that Act pursuant to 18 U.S.C. §§ 1962(d); as well as for claims pursuant to the False Claims Act (Violations of 31 U.S.C. § 3730(h)); Virginia's Fraud Against Taxpayers Act (Retaliation) (Violation of Va. Code Ann. § 8.01-216.1, et seq.); Virginia's Fraud and Abuse Whistleblower Protection Act (Retaliation) (Violations of Va. Code § 2.2-3011); Negligent Hiring and Retention; and Defamation.

## JURISDICTION AND VENUE

56.     Jurisdiction is conferred on this Court by 28 U.S.C. § 1331, as this action arises under the laws of the United States, and 28 U.S.C. § 1337, as this action arises under laws of the United States affecting interstate commerce.

57.     Supplemental jurisdiction over the state law claims asserted herein is conferred upon this Court by 28 U.S.C. § 1367(a). The transactions and occurrences giving rise to the Plaintiffs' state law claims arose out of the same common nucleus of operative facts as those giving rise to their federal law claims. The state law claims asserted herein form part of the same case or controversy as the federal law claims.

58.     The Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

59.     Venue is proper in this district pursuant to 18 U.S.C. § 1965(a) and 28 U.S.C. §§ 1391(b) and (c).

## PARTIES AND NON-PARTY PARTICIPANTS

**A. Plaintiffs**

60.     Plaintiff Linda Schumann, Administrator of the Estate of Thomas John Schumann, deceased, is an individual of the full age of majority and is the widow of Mr. Thomas John Schumann, who died under the care of an incompetent physician hired by the Entity Defendants to further and to execute the illegal scheme outlined herein.

61.     Plaintiff Carrie Finch-Smith, Administrator of the Estate of James Gordon Smith, deceased, is an individual of the full age of majority and is the widow of Mr. James Gordon Smith,

who died under the care of an incompetent physician hired by the Entity Defendants to further and to execute the illegal scheme outlined herein.

62.     Plaintiff Dr. Jeffrey S. Young is an individual of the full age of majority and was the Director of the UVA Trauma Center, employed by the Entity Defendants, until he was replaced with no notice effective in August of 2024. Dr. Young was on the faculty at the UVASOM as Professor of Surgery for 30 years, from July 1, 1994 to December 2024. Dr. Young is a resident of Charlottesville, Virginia, where he has lived throughout the time that he was targeted by the Kent Enterprise.

63.     Plaintiff Dr. Kenan W. Yount is an individual of the full age of majority and a cardiac surgeon, employed by the Entity Defendants, who attended UVASOM from 2006 to 2011, was employed by UVAMC from 2011 to 2018, and was on the faculty at the UVASOM as an Assistant Professor from July 1, 2018 to March of 2025, and an Associate Professor until he left the UVA Affiliates in July of 2025. He was elected by his peer faculty across UVASOM to the UVA Faculty Senate in 2021 and was re-elected in 2025. He twice received the UVAHS Patient Experience Award and he was nominated by his students for the UVASOM Dean's Teaching Award (the receipt of which, upon information and belief, KIBBE ultimately denied him as retaliation). He received the President's Award of the Society of Thoracic Surgeon's for his research, and he remained a top enroller in National Institutes of Health sponsored clinical trials for UVAHS. At the time Dr. Yount left his job at UVA Affiliates, an analysis performed by the Chief Strategy and Quality Officer for the Heart and Vascular Service Line of his Society of Thoracic Surgeon's outcomes in the Biome Analytics database, showed his surgical outcomes across all major types of heart surgeries to be in the top 95% in the country. Prior to his departure, he was also the UVA Affiliates' highest volume cardiac surgeon from 2022-2024. Dr. Yount is a resident of Ponte Vedra

Beach, Florida, although he lived in Charlottesville, Virginia at all times that he was targeted by the Kent Enterprise.

64.    Plaintiff Dr. Mark E. Roeser is an individual of the full age of majority and a pediatric cardiac surgeon, employed by the Entity Defendants, who was on the faculty at the UVASOM as an Assistant Professor from his hire in 2015 to June 30, 2022, and an Associate Professor from July 1, 2022 until he was constructively discharged by the UVA Affiliates in November of 2024. Dr. Roeser was born with congenital heart disease and therefore, has a close connection with his patients. He is a brilliant surgeon who operates on people with congenital heart defects of all ages and diagnoses. Most notably, he performed the first bilateral pediatric lung transplant for pulmonary hypertension in the state of Virginia, the first successful Berlin heart Left Ventricle Assist Device implantation, the first successful Berlin heart Biventricular Assist Device implantation, and the first successful pediatric Heartware Ventricular Assist Device implantation in the state of Virginia. While working for the UVA Affiliates, Dr. Roeser was one of few doctors in the nation to receive an NIH RO1 grant worth $2.6 million to the UVA Affiliates. Dr. Roeser is currently a resident of Charlotte, North Carolina, although he lived in Charlottesville, Virginia at all times that he was targeted by the Kent Enterprise.

65.    Plaintiff Dr. John A. Kern is an individual of the full age of majority, the current Surgical Director of the Heart and Vascular Service Line and Chief of the Cardiothoracic Surgery Division of the Department of Surgery, employed by the Entity Defendants. Dr. Kern has been at the UVA Affiliates for 40 years. He has been on the faculty at the UVASOM and UVAHS since 1998 as a Professor of Thoracic and Cardiovascular Surgery, advancing from Associate to Assistant to Full Professor with Tenure; has been the Program Director for the UVA Cardiothoracic Surgery Program through the Accreditation Council for Graduate Medical Education for fourteen years

(winning the Thoracic Surgery Residents Association's illustrious Socrates Award for Cardiothoracic surgery education); and has been the Stanton P. Nolan Professor of Surgery at the Entity Defendants for approximately ten years. Dr. Kern has received innumerable honors and awards over the years, including, to name just a few, Newsweek Magazine's #7 Cardiothoracic Surgeon in the United States; a Virginia Business Magazine's Top Cardiothoracic Surgeon; UVAHS's Dean's Master Clinician and Top Performer in Patient Satisfaction Awards, and Central Virginia Magazine's Best Bedside Manner Award. Dr. Kern is a resident of Charlottesville, Virginia, where he has lived throughout the time that he was targeted by the Kent Enterprise. He remains employed by the UVA Affiliates, hoping to bring them back from the ashes to which they have devolved as a result of the Kent Enterprise described herein.

## B. Defendants

66.    Defendant KENT is an individual of the full age of majority and, upon information and belief, a resident of Charlottesville, Virginia, and the former Chief Executive Officer of the UVAHS and Executive Vice President for health affairs at UVA. KENT was employed by the Entity Defendants. KENT is named individually and in his official capacity as Chief Executive Officer of the UVAHS and Executive Vice President for health affairs at UVA.

67.    At all pertinent times and places, KENT was an employee of UVAHS and UVA acting within the course and scope of his employment.

68.    At all pertinent times and places, KENT was also an employee of UPG acting within the course and scope of his employment. To wit, KENT was a member of the UPG Board of Directors, where he was able to further the illegal scheme described herein, silence dissent, and eliminate those who opposed the scheme.

69.     KENT received substantial compensation from UPG in addition to the handsome compensation that he received from UVAHS and UVA.

70.     When KENT'S earnings from UPG are combined with his earnings from UVAHS and UVA, KENT'S total cash compensation was almost $1,600,000 as of 2022.[7]



*UPG Form 990, p. 7, for tax year 2022*

71.     Defendant KIBBE is an individual of the full age of majority and, upon information and belief, a resident of Houston, Texas, and the former Dean of the UVASOM. She was employed by the Entity Defendants. KIBBE is named individually and in her official capacity as Dean of the UVASOM.

72.     At all pertinent times and places, KIBBE was an employee of UVAHS and UVA acting within the course and scope of her employment.

73.     At all pertinent times and places, KIBBE was also an employee of UPG acting within the course and scope of her employment.  To wit, KIBBE was a member of the UPG Board

---

[7] "Craig Kent, chief executive officer of U.Va. Health and executive vice president for health affairs at the University, remains the highest-paid individual at the University with a salary of $1.6 million. Kent's 2024 salary marks a $500,000 pay raise compared to last year, and he previously received a $50,000 pay raise going into 2023." https://www.cavalierdaily.com/article/2024/08/universitys-ten-highest-paid-employees-receive-salary-increases-in-2024?

of Directors, where she was able to further the illegal scheme described herein, silence dissent, and eliminate those who opposed the scheme.

74.    KIBBE received substantial compensation from UPG in addition to the handsome compensation that she received from UVAHS and UVA.

75.    When KIBBE'S earnings from UPG are combined with her earnings from UVAHS and UVA, KIBBE'S total cash compensation was almost $1,100,000 as of 2022.[8]



*UPG Form 990, p. 7, for tax year 2022*

76.    Defendant HORTON is an individual of the full age of majority and, upon information and belief, a resident of Charlottesville, Virginia, and the former Chief Operating Officer and Chief Executive Officer of the UVAMC. She was employed by the Entity Defendants. HORTON is named individually and in her official capacity as Chief Operating Officer and Chief Executive Officer of the UVAMC.

---

[8] "The third highest earner at the University is Melina R. Kibbe — dean of the School of Medicine, Medicine professor and chief health affairs officer — earning $829,000 this year, a nearly 23 percent increase from last year's $674,100. Kibbe is the highest earning University employee who also works as a professor." https://www.cavalierdaily.com/article/2024/08/universitys-ten-highest-paid-employees-receive-salary-increases-in-2024?

77.    At all pertinent times and places, HORTON was an employee of UVAHS and UVA acting within the course and scope of her employment.

78.    At all pertinent times and places, HORTON was also an employee of UPG acting within the course and scope of her employment.  To wit, HORTON was a member of the UPG Board of Directors, where she was able to further the illegal scheme described herein, silence dissent, and eliminate those who opposed the scheme.

79.    HORTON received substantial compensation from UPG in addition to the handsome compensation that she received from UVAHS and UVA.

80.    When HORTON'S earnings from UPG are combined with her earnings from UVAHS and UVA, HORTON'S total cash compensation was a little more than $1,200,000 as of 2022.



*UPG Form 990, p. 7, for tax year 2022*

81.    Defendant TSUNG is an individual of the full age of majority and, upon information and belief, a resident of Charlottesville, Virginia, and Chief of the Department of Surgery at the UVAHS, a physician in leadership. He is employed by the Entity Defendants. Dr.

Tsung is named individually and in his official capacity as Chief of the Department of Surgery at the UVAHS.

82.     At all pertinent times and places, TSUNG was an employee of UVAHS and UVA acting within the course and scope of his employment.

83.     At all pertinent times and places, TSUNG was also an employee of UPG acting within the course and scope of his employment.

84.     Defendant PREVENTZA is an individual of the full age of majority and, upon information and belief, a resident of San Antonio, Texas, and was the former Chief of the Division of Cardiothoracic Surgery in the Department of Surgery and Co-Director of the Heart and Vascular Service Line at the UVAHS, a physician in leadership. She was employed by the Entity Defendants. PREVENTZA is named individually and in her official capacity as Chief of the Division of Cardiothoracic Surgery in the Department of Surgery and Co-Director of the Heart and Vascular Service Line at the UVAHS.

85.     At all pertinent times and places, PREVENTZA was an employee of UVAHS and UVA acting within the course and scope of her employment.

86.     At all pertinent times and places, PREVENTZA was also an employee of UPG acting within the course and scope of her employment.

87.     Defendant DE LA CRUZ is an individual of the full age of majority and, upon information and belief, a resident of Newton, Massachusetts, and was a former Associate Professor of Surgery in the Division of Cardiothoracic and Vascular Surgery in the Department of Surgery and a Co-Director of the Aortic Disease Program at the UVAHS, a physician in leadership. He was employed by the Entity Defendants. DE LA CRUZ is named individually and in his official capacity as Co-Director of the Aortic Disease Program at the UVAHS.

88.     At all pertinent times and places, DE LA CRUZ was an employee of UVAHS and UVA acting within the course and scope of his employment.

89.     At all pertinent times and places, DE LA CRUZ was also an employee of UPG acting within the course and scope of his employment.

90.     Defendant the Rector and Visitors of the University of Virginia is a research university located in Virginia and the corporate entity under which the institution UVA, including UVASOM, UVAHS, and UVAMC do business. UVAHS and UVAMC are permitted to form, own, and/or control private corporations, partnerships, insurers, or other entities. *See* Va. Code § 23.1-2212(c). They can also issue bonds, notes, guarantees, and other indebtedness provided, however, that such debts cannot in any way make the University, the Commonwealth, or any agency of the Commonwealth liable for such obligations. *Id.*

91.     Defendant UPG is a Virginia nonstock corporation with its principal place of business in Virginia. UPG is also registered as a 501(c)(3) public charity. UPG is a private entity associated with UVA that works in support of the UVAMC and UVASOM, with offices located in Charlottesville, Virginia. UPG and UVASOM jointly employ clinical faculty at UVA Affiliates UVAMC. UPG is not in any way controlled by the Commonwealth of Virginia. It has its own Board, its own payment collections apparatus, its own captured legal counsel and retained risk/liability reserves, and its own separate management hierarchy.   UPG had in excess of $650,000,000.00 in revenue in 2024, no portion of which was returned to the Commonwealth of Virginia's Treasury Department.

92.     Defendants are individuals, entities and governing bodies that are well aware of the claims of physicians and staff at the UVA Affiliates, which played an integral part in a public controversy regarding the attempts of the Kent Enterprise to maximize revenues and elevate

rankings at the Entity Defendants through the use of fraudulent and dangerous means that conflicted with the best interests of the physicians and staff and the patients of the Entity Defendants.

## DEFENDANTS' UNLAWFUL SCHEME

**The Kent Enterprise**

93.    This action arises from an ongoing and systematic pattern of fraud, abuse, harassment, intimidation, threats, and retaliation at the Entity Defendants, orchestrated and controlled by a network of top executives, administrators and clinical leaders known herein as the "Kent Enterprise." Named for KENT, who served as Chief Executive Officer of the UVAHS and Executive Vice President for health affairs at UVA, this Kent Enterprise operated through key institutional arms—the UVA Affiliates and UPG—and prioritized profit and control over compliance, ethics, and patient safety.

94.    In February 2020, KENT became executive vice president of UVAHS, despite UVA's President Jim Ryan and the BOV being made aware that he had been subject to three "no confidence" letters during his tenure at Ohio State University.[9]

95.    KENT initiated his consolidation of power at the UVA Affiliates immediately upon his hire by unilaterally appointing HORTON, a former subordinate of KENT at the University of Wisconsin and Ohio State, as COO and soon thereafter, CEO of the UVAMC. HORTON joined UVA in April 2020, just two months after KENT, following overlapping tenures with him at both Ohio State University (where KENT was Dean of the College of Medicine and HORTON was Chief Administrative Officer from 2017 to 2020) and the University of Wisconsin (where both

---

[9] "Wexner Medical Center CEO Steps Down amid Questions of Leadership," The Lantern, May 9, 2017. "Faculty Letter Expresses 'No Confidence' in OSU Wexner Medical Center CEO," The Columbus Dispatch, May 6, 2017. "UVA's Not the First No Confidence Letter for Craig Kent," Cville Right Now, September 23, 2024.

held senior leadership roles between 2008 and 2016). The following represents the overlap of employment of KENT and HORTON at medical institutions.



96.    The hiring of HORTON was done without meaningful faculty input or a competitive search process, both of which had been the norm at the Entity Defendants, signaling KENT's intent to sidestep established governance norms, to hire people willing to participate in fraudulent billing practices, and to entrench loyal leadership that would carry out his schemes.

97.    In early April 2020, just months into KENT's tenure, Dr. Chris Ghaemmaghami—then a Professor of Emergency Medicine, a Clinical Liaison for clinical activities among the Entity Defendants, and the interim CEO of UVA Medical Center—submitted a confidential resignation letter directly to University President Jim Ryan. In the letter (attached hereto as *Exhibit 2*), Dr. Ghaemmaghami provided an early and pointed warning regarding what he believed to be serious and systemic leadership deficiencies in the newly appointed Executive Vice President for Health Affairs, KENT. Dr. Ghaemmaghami expressed concern that KENT was not only disinterested in safety, quality, or transparency, but had also fostered a "command and control" style of leadership

that discouraged input, suppressed internal communication, and prioritized financial metrics—particularly surgical revenues—over patient care and physician judgment.

98.    Dr. Ghaemmaghami's letter also detailed his personal observations that KENT was leading from a place of fear and accountability avoidance, rather than principled courage. He further observed that KENT had centralized all decision-making power, micromanaging operations, eliminating transparency, and disregarding long-standing norms of collaborative leadership. He warned that KENT had already purged two senior UVA Medical Center leaders, bypassed him in staffing decisions, and forbade communications from other senior leaders without his approval. Dr. Ghaemmaghami concluded that he could no longer serve under a regime where loyalty to KENT took precedence over institutional values and patient safety. Despite the gravity of these observations, and the credibility of the author, President Ryan and other UVA leadership failed to take any corrective action or investigate the claims.

99.    This letter now stands as one of the earliest and clearest internal warnings that the Kent Enterprise was in the process of consolidating power over the UVA Health System by installing loyalists, eliminating dissenters, and reorienting the health system away from its mission by shifting its focus to revenues from patient outcomes. Under KENT, physicians were subjected to relentless pressure to maximize billing and generate revenue, with compensation, advancement, and even continued employment tied to compliance with those financial imperatives rather than adherence to patient care standards. The concerns outlined by Dr. Ghaemmaghami foreshadowed precisely the conduct that would later give rise to the instant Complaint: the subversion of medical judgment for financial gain, the centralization of power in a small inner circle, the erosion of

internal checks and balances, and the prioritization of reputational and political loyalty over transparency, legality, and, most importantly, patient safety and welfare.

100.    From there, the Kent Enterprise continued to take form with KENT's removal of individuals he could not control such as Dr. Ghaemmaghami, others high in leadership, and the **more than 550** faculty members and **16 of 21 Clinical Department Chairs** at UVASOM the Kent Enterprise replaced, and his strategic installation of HORTON and additional loyalists into positions of unchecked power, such as KIBBE, who was installed as Dean of UVASOM in July of 2021.

101.    With these appointments, KENT circumvented institutional norms and imposed a regime in which financial growth and brand management took precedence over compliance, ethics, and patient safety.

102.    KENT systematically removed respected leaders across the UVA Affiliates, including the abrupt ousting of a few widely admired physicians-executives in leadership roles at the Entity Defendants. Working in tandem with co-conspirators HORTON and KIBBE, KENT proceeded to dismantle longstanding safeguards and oversight systems designed to protect patient safety and ensure legal compliance. In their place, the conspirators implemented a regime singularly focused on maximizing revenue—often through fraudulent and unethical means.

103.    This trend continued with the June 2022 recruitment of TSUNG as Chair of the Department of Surgery at UVASOM less than a year after KIBBE's appointment. In keeping with this pattern of nepotistic hiring, TSUNG had previously served under KENT and HORTON at Ohio State, where he was Chief of the Surgical Oncology Division. Prior to his time at Ohio State, TSUNG spent nearly two decades at the University of Pittsburgh Medical Center, where his professional path overlapped with KIBBE during their surgical residencies from 2000 to 2002,

35

further illuminating the cronyism at play in the Kent Enterprise. Like HORTON, KIBBE became a key player in implementing KENT's agenda through loyalists like TSUNG and by building a network of individuals in positions of power to carry out the Kent Enterprise's schemes to generate revenue and secure control over the Entity Defendants.

104.    Becker's Hospital Review reports that over time, since her hire in mid-2021, KIBBE oversaw the hiring of *more than 550* faculty members and replaced *16 of 21 Clinical Department Chairs* at UVASOM. These hires were achieved through processes entirely different than any hiring norms previously in place.

105.    Before KENT and KIBBE were in place at the Entity Defendants, the process for hiring chairs of clinical departments had been collaborative, with physicians in the departments weighing in on who was to lead them, but after KENT, HORTON and KIBBE were placed in charge, across a variety of different departments, including cardiothoracic surgery,  neurology and pediatric neuropsychology, and microbiology, immunology, and cancer biology, just to name a few, that collaboration was no longer the norm. The Kent Enterprise alone decided who was to go and who would replace those who had been ushered out.

**The Kent Enterprise Spent Millions of Dollars Hiring Two Incompetent Individuals**

106.    KENT and KIBBE along with two other individuals sat on a "Selection Committee," which singlehandedly chose the department chair candidates to be interviewed and ultimately hired. That Selection Committee provided the names of the individuals chosen by KENT and KIBBE to an individual department's "Search Committee" that then interviewed the candidates forced on them and put together background materials, including the department's recommendation as to who to hire and who not to hire. The materials and department recommendations were then transferred to and reviewed by the Kent Enterprise in deciding who

to hire. More often than not, those actually hired had been in the bottom of the candidate pool recommendations made by the Search Committee, which was made up of physicians practicing in the departments at issue. Central to the Kent Enterprise here was the hiring and placement of PREVENTZA as Chief of Cardiothoracic Surgery. After being ushered into UVA, PREVENTZA was directly implicated in co-surgeon billing fraud at her prior institution, Baylor St. Luke's Medical Center ("Baylor") in Houston, Texas, for which the institution agreed to pay $15 million in settlement, as announced by the U.S. Department of Health and Human Services.



107.    Additionally, PREVENTZA was fined by the Texas Medical Board for submitting a false or misleading statement when applying for a license there, and a year later, fined by the Illinois Department of Financial and Professional Regulation for the same false or misleading statement. Defendants knew or should have known about these actions taken against PREVENTZA because information as to these actions are in the public record, shown here:



108.    Moreover, a review of PREVENTZA's case log at Baylor showed that she was typically an assistant surgeon rather than a primary surgeon; her work there was more administrative than clinical. The Division of Cardiothoracic Surgery at the UVA Affiliates, however, needed another primary surgeon.

109.    Despite all but one member of the Search Committee for the position PREVENTZA would ultimately fill *rejecting her candidacy* and recommending the search for a Chief of the

---

[10] Virginia Board of Medicine Practitioner Information,
https://www.vahealthprovider.com/results_act.asp?License_No=0101279185 (last visited 8/14/25).

Division of Cardiothoracic Surgery in the Surgery Department be started all over again, and notwithstanding the documentation of her prior misconduct—including her own false or misleading statement made to the Texas and Illinois Medical Boards in the context of her licensing in those states—KENT and KIBBE forcibly installed PREVENTZA into the role of Chief of the Cardiothoracic Division of the Department of Surgery.

110.    PREVENTZA was hired by the Kent Enterprise despite actual knowledge of her lack of surgical skill or administrative experience and her dangerous incompetence, because the Kent Enterprise knew (based on their conversations with her, including direct statements made in her interview, and based on her past experience participating in billing schemes that inflated revenue, which were later publicly revealed to be fraudulent) that she would willingly participate in their unlawful predicate acts, including mail fraud, wire fraud, healthcare fraud, extortion, and witness tampering.

111.    During the search that ended with PREVENTZA's hire, the Chief Strategy and Quality Officer for the Cardiovascular Service Line told TSUNG, the Chair of the Department of Surgery, that the search should be considered a failed search and should be started all over again. Only five of the potential candidates for the position were top-notch, and none of those five accepted the position. That left only mediocre to terrible candidates.

112.    TSUNG rummaged through the remaining candidates and chose PREVENTZA, a physician whom KIBBE had befriended via societal committees, from the very worst of the worst candidates—the "trash pile." There were quality concerns raised by all of the surgeons over whom PREVENTZA would preside in her Chief role, many of whom received calls from former

colleagues of PREVENTZA's, advising that she was not capable of operating alone, and that she was a bully and impossible to work with.

113.    The Chief Strategy and Quality Officer for the Heart and Vascular Service Line told Chief Medical Officer Reid Adams that she was concerned that PREVENTZA did not have appropriate qualifications; that she had rarely operated alone; and that she had mostly scrubbed in with a senior partner in her former position. Adams said that determining the qualifications of a candidate was a job for the Department Chair, TSUNG. After KENT declined meetings to hear concerns about PREVENTZA directly, these concerns were relayed to his designated ambassador, the Executive Director for Clinical Growth and Outreach, as well as TSUNG.

114.    PREVENTZA was hired in April of 2023, over strong objection from those she was to work with and, in fact, lead. TSUNG told the Chief Strategy and Quality Officer that the decision to hire PREVENTZA came straight from KENT and on October 12, 2023, TSUNG re-confirmed that the decision to hire PREVENTZA was not his.

115.    PREVENTZA immediately began attempting replication of her previous illegal and dangerous practices when she arrived at the Entity Defendants. Beginning as early as during her interview process, she often extolled the use of fraudulent double-billing and advocated that the UVA Affiliates adopt the process. The problem with double-billing—the practice of billing for two primary surgeons when there is a perfectly capable resident assisting in the operating room—is that it is illegal in Virginia and not allowed by Medicare billing regulations and federal healthcare program rules. During her interview process, PREVENTZA also expressed interest in replicating a scheme used in Texas to "dump" high risk patients onto affiliate hospitals within a health system to avoid harming the reputation of the flagship hospital within the health system.

116.    Leadership at the Entity Defendants intended that PREVENTZA would ultimately become one of the Enterprise's primary sources of revenue, generating substantial profits through a series of coordinated racketeering activities. In practice, PREVENTZA failed to take call and to operate and did not meet with residents or faculty for months after she arrived, demanded falsification of operative reports, and created a culture of fear and moral distress in and out of the operating room. PREVENTZA's behavior sent several resident physicians to counseling because of the stress they endured working with her. PREVENTZA, along with her co-conspirators, committed acts of insurance, wire, and mail fraud, in furtherance of the Kent Enterprise during this time by, among other things, implementing illegal and fraudulent double-billing and up-coding practices. Her actions and incompetence directly led to preventable patient death, including incidents that shocked even experienced surgical staff. The Physician Plaintiffs raised concerns about PREVENTZA to leadership repeatedly, only to be marginalized, retaliated against, and ultimately forced from their own leadership roles.

117.    In April of 2024, a year after PREVENTZA's hire was announced, the Chief Strategy and Quality Officer for the Heart and Vascular Service Line met with the Chair of the Department of Surgery, TSUNG, regarding quality and professionalism concerns about PREVENTZA, outlining her specific concerns as to the incompetence of PREVENTZA in a document she later shared with "multiple levels of senior administration to no avail," including the Chief Medical Officer at the Entity Defendants and ultimately, the Credentials Committee. *Exhibit 10*.

118.    The Patient Safety Concerns outlined in that document include, generally:

"•      Preventza leaves notes unsigned for long periods of time making it very difficult for support staff to understand the plan and leaves them in a bad position when patients call to find out the plan for their cases.

•      Support staff often have to play quarterback after Preventza's visits with patients because she "scares patients and makes them cry" when discussing surgery with them. The patients are often very confused by her explanations and nursing is having to console patients after she leaves the room.

•      Preventza has decided to unfairly assign more call to herself and her 2 new hires. This has created moral distress for referrals because a majority of these patients are turned down for surgery, leaving referrals in an impossible predicament.

•      From nursing: "I'm exhausted after a clinic with her."  "She is very indecisive about patient plans and very hesitant to operate."

•      From nursing: She calls patients and staff "fat" to their faces.

•      Preventza's volumes are low.  Her bypass and cross-clamp times are above the averages of our other experienced surgeons." *Id.*

119.    As her power grew, and her fraudulent and dangerous practices brought in more revenue, PREVENTZA brought in DE LA CRUZ, a surgeon with a known history of ongoing clinical probation, unsafe outcomes, and unresolved disciplinary issues stemming from his work at Brigham and Women's Hospital in Boston, Massachusetts. At Brigham and Women's Hospital, DE LA CRUZ was not allowed to operate without a proctor.  Although the Credentialing Committee at the UVA Affiliates was powerless to stop the hiring of DE LA CRUZ, they did

impose a similar proctoring requirement on DE LA CRUZ over stern objections from members of the Kent Enterprise.

120.    DE LA CRUZ was hired by the Kent Enterprise despite actual knowledge of his lack of surgical skill or administrative experience, as well as his dangerous incompetence, because the Kent Enterprise knew (based on their conversations with him and based on his past experience participating in publicly-disclosed fraudulent schemes) that he would willingly participate in their unlawful predicate acts, including mail fraud, wire fraud, healthcare fraud, extortion, and witness tampering. The hiring of DE LA CRUZ is further emblematic of the nepotism driving faculty appointments within the Kent Enterprise. Before his stint at Brigham and Women's Hospital, DE LA CRUZ worked with PREVENTZA at Baylor in Texas for approximately ten years. This time period also was the time period scrutinized by the United States Department of Justice in its $15 million settlement with that institution's heart surgery program, where DE LA CRUZ served on the Billing Task Force, was charged with overseeing "clinical documentation compliance," and served as Joseph Coselli's assistant along with PREVENTZA. Notably, the UVA Affiliates appointed DE LA CRUZ as "Advisor for Clinical Documentation Improvement" to "promote compliance with governmental and private payer regulations and appropriate physician coding and documentation requirements."

121.    During the hiring process of DE LA CRUZ, the cardiac surgeons at the UVA Affiliates received many unsolicited calls and other contacts from former colleagues and supervisors warning against his incompetence. These surgeons raised these issues with the Credentials Committee, who raised the concerns with TSUNG and all the way up to the BOV.

122.    Despite these poor reviews, the Chair of the Department of Surgery, TSUNG, whose job it was to check on the credentials of incoming surgeons, did not even place a call to DE

LA CRUZ's former employer, although he reported that he had made the call. Instead, TSUNG instructed his co-conspirator, PREVENTZA (who had previously declared in a conversation she mistakenly recorded that she would "kill herself" if she could not quickly hire co-conspirator physicians aligned with her) to make the call to DE LA CRUZ's former employer to check on his privileges there. The chief of cardiac surgery at Brigham and Women's Hospital told Dr. Kern, who called him after DE LA CRUZ's privileges were pulled, that he had told PREVENTZA when she called to check on his privileges at Brigham and Women's prior to DE LA CRUZ's hire by the UVA Affiliates, that DE LA CRUZ was on probation at Brigham and Women's, which disallowed him from performing Coronary Artery Bypass Graft ("CABG") surgery alone. The chief at Brigham and Women's also told Dr. Kern that if DE LA CRUZ had not left Brigham and Women's Hospital, he would have been fired. Finally, the chief also told Dr. Kern that he told PREVENTZA when she called prior to the UVA Affiliates' hire of DE LA CRUZ, that he "lost sleep" worrying about DE LA CRUZ's incompetence and was constantly considering reporting DE LA CRUZ to the state medical board due to his incompetence. PREVENTZA did not communicate these messages to the cardiac surgeons he would be working with.

123.    Nevertheless, KENT and KIBBE again disregarded internal opposition and allowed DE LA CRUZ to join the faculty. Leadership at the Entity Defendants and members of the Kent Enterprise knew exactly what they were getting with DE LA CRUZ: an incompetent heart surgeon who would support their illegal scheme just like KENT, HORTON, KIBBE, AND PREVENTZA.

124.    Just like at Brigham and Women's Hospital, DE LA CRUZ had limits placed on his privileges by the Credentials Committee of the UVAMC on behalf of the Clinical Staff Executive Committee and approved by the Health System Board. DE LA CRUZ was not permitted to perform a CABG independently and instead required monitoring by a proctor qualified to perform a CABG

independently, who was to watch over him the whole time in any CABG for which he was to take a primary surgeon role. It is curious that an esteemed medical care facility such as UVAHS would hire a doctor who needs a proctor to perform basic heart procedures, unless some ulterior motive to the hire, such as manipulability of the hire or plan for double billing, existed.

125.    In November of 2024, DE LA CRUZ was assigned a patient named Thomas John Schumann who needed a CABG procedure. Dr. Kern, a senior cardiothoracic surgeon with surgical experience at UVA dating back to 1998 and who served as a former Co-Director of the Heart and Vascular Service Line and has an abundance of experience and accolades, a fraction of which are outlined above, offered to be the required proctor over the case. Likewise, Dr. Yount offered to proctor. Instead, PREVENTZA and DE LA CRUZ, with the knowledge and affirmance of TSUNG, decided that the newest member of the Cardiothoracic Department, Dr. Adanna Akujuo (who was herself hired by PREVENTZA) should act as the proctor.

126.    DE LA CRUZ never disclosed to Mr. Schumann or his family that he had limited surgical privileges, was previously suspended, had not and could not operate independently, and required a proctor for all of his CABG procedures.

127.    Dr. Akujuo was so new to the Entity Defendants that she was not aware of the UVA Bylaws' proctoring rules—one of which was that she had to remain in the operating room throughout the surgery—and Akujuo spent some time during the operation outside of the operating room in the Control Room. Had Dr. Kern been the proctor for this case, the damage and resultant death never would have occurred. This is because Dr. Kern was well aware of the proctoring rules and would have remained present throughout the procedure. The cause of the damage, an aortic balloon pump, either never would have been used or never would have been used incompetently.

128.    DE LA CRUZ began the November 18, 2024 procedure without his proctor, Dr. Akujuo, in the room. He almost immediately encountered a problem with the aortic balloon pump which gave an alarm that DE LA CRUZ merely silenced because he did not know how to use the pump properly. During the procedure, the incompetence of DE LA CRUZ and Akujuo and their lack of understanding in how to use the balloon pump resulted in a massive air embolism which caused Mr. Schumann to suffer a fatal ischemic stroke.

129.    After the failure of the balloon pump, Akujuo made a decision to pull the balloon out through the sheath located in Mr. Schumann's upper thigh, which any experienced cardiothoracic surgeon would know was impossible to do. The result of this decision was a shredding of the balloon which remained in the leg throughout the remainder of the procedure. Had Mr. Schumann not sustained a massive, inevitably fatal stroke due to the air embolism, he would have lost his leg due to acute limb ischemia resulting from the bypass pump remaining in the leg through the duration of the surgery.

130.    DE LA CRUZ was not only an incompetent surgeon who caused a fatality at the UVA Affiliates. In addition, DE LA CRUZ, under the direction of Kent Enterprise leadership, including PREVENTZA, engaged in fraudulent billing practices, including upcoding surgical risk levels to inflate reimbursement rates, and fraudulent charting, including falsification of medical records to avoid malpractice liability. By fraudulently upcoding risk levels, the Kent Enterprise raised the apparent complexity of patients and created an illusion that the UVA Affiliates cared for a body of patients that had more complex—thus, more expensive—medical issues.

131.    For example, as described in a letter sent to the Credentials Committee and attached hereto as *Exhibit 10* regarding quality control over surgical failures, in the Schumann case, after he had caused a fatal complication to Mr. Schumann as the result of his own incompetence, DE

LA CRUZ fraudulently altered Mr. Schumann's risk score for the procedure. The risk score is a tool devised by the Society of Thoracic Surgeons and used to predict the risk of complications and mortality after coronary artery bypass grafting surgery. Preoperatively, DE LA CRUZ informed Mr. Schumann, his wife, and his daughters that Mr. Schumann had a risk factor of death of approximately 3%. He also documented this in the patient's electronic medical record.

132.    Postoperatively, in an attempt to cover up his own incompetence after the death of Mr. Schumann, DE LA CRUZ changed that risk score from 3% to 20+%. DE LA CRUZ intended this post-operative falsification to serve two purposes. First, it triggered a higher, complexity-driven Medicare reimbursement for the procedure—thus increasing the profits of all named Defendants and furthering the Kent Enterprise's financial goals. Second, the falsification sought to minimize any potential malpractice liability for DE LA CRUZ, UVAHS, UPG, and others arising out of Mr. Schumann's death—thus decreasing financial losses and, again, furthering the Kent Enterprise's financial goals.

133.    The fraudulent alteration of Mr. Schumann's risk score was not a victimless administrative act. By inflating the risk of death from 3% to 20+% after the fact, DE LA CRUZ not only ensured an improper financial gain for himself and the Kent Enterprise, but also created a false narrative that Mr. Schumann's death was an unavoidable outcome rather than the result of gross incompetence. This fabrication deprived the Schumann family of the truth about what had happened, obstructed meaningful accountability within UVAHS, and directly undermined the ability of other clinicians to learn from the fatal errors in Mr. Schumann's care. It also deterred witnesses to the malpractice, including other members of the care team, from reporting what they had observed, since the official record now reflected a falsified account that blamed the patient's supposed high-risk profile rather than DE LA CRUZ's errors. In this way, the falsification was

causally linked to Mr. Schumann's death and its aftermath, converting what should have been a preventable malpractice event into an institutionalized cover-up that perpetuated the same risks for future patients.

134.    Additionally, under the direction of the Kent Enterprise leadership, including PREVENTZA's, DE LA CRUZ engaged in gross negligence and fraud by never disclosing to the Schumanns that DE LA CRUZ was unable to perform a CABG without a proctor, and failed to relate that the proctor would be one of the newest members of the cardiothoracic surgery department, a surgeon herself practicing under provisional privileges.

135.    In a shockingly similar incident, PREVENTZA failed to diagnose and treat a stroke suffered by James Smith.[11] This stroke occurred while Mr. Smith was under PREVENTZA's direct medical care. In fact, not only did PREVENTZA cause the stroke through her incompetence during a routine surgical procedure, and then fail to diagnose the stroke, but PREVENTZA *refused* even to acknowledge a stroke as a medical possibility despite the urgings of several other qualified medical professionals. PREVENTZA went so far as to prevent other care providers from investigating what had happened to Mr. Smith (e.g., by preventing the order of a brain MRI) or even treating the symptoms of stroke, including by sending the patient to a stroke care unit. Providers throughout the hospital were shocked that PREVENTZA was actively prohibiting them from treating Mr. Smith's obvious stroke.  PREVENTZA even "asked a fellow to lie in [Mr. Smith's] chart. The patient had undergone CABG and suffered a stroke. [PREVENTZA] asked the fellow to counter the neurology note and state that the patient's left sided deficits were due to his drug use and that it would resolve." PREVENTZA "refused to further image the patient to prove

---

[11] This incident is described further in the "Quality Control over Surgical Failures" document attached hereto as *Exhibit 10*.

the stroke was present stating over and over that it was drug use and that it would all get better. Ultimately the patient deteriorated into multiorgan failure." *Id*.

136.    Yet, PREVENTZA's egregious conduct in Mr. Smith's case continued. Rather than acknowledging her failures and passing Mr. Smith's care on to another doctor, PREVENTZA maintained an iron fist on the case and refused all advice from her fellow practitioners. At one point, PREVENTZA "physically manhandled a female first-year surgical resident and forced her to sit in a chair and write an order that everyone knew would kill [Mr. Smith]." *Id.* Despite clear opposition from the care team, PREVENTZA physically forced the resident to order a fatal medication to be administered to Mr. Smith, who had already suffered greatly by PREVENTZA'S malpractice. Immediately upon receipt of the forced order, the Department of "Endocrinology called the resident and asked what she was doing because this would kill the patient. This created moral distress for the resident." *Id*.

137.    PREVENTZA's falsification and suppression of Mr. Smith's medical record had catastrophic consequences. By refusing to acknowledge the stroke, ordering subordinates to omit and even falsify documentation, and blocking appropriate testing and treatment, PREVENTZA ensured that Mr. Smith's condition deteriorated unchecked until it culminated in multiorgan failure and death. The fraudulent manipulation of Mr. Smith's chart was the mechanism through which lifesaving interventions were foreclosed, liability was concealed, and the Kent Enterprise's financial interests were placed above patient welfare. The causation is direct: the falsification of records prevented timely diagnosis and treatment of a stroke, which in turn led to Mr. Smith's preventable death.

138.    PREVENTZA (1) refused to acknowledge and document Mr. Smith's stroke, (2) attempted to pressure other physicians into omitting the stroke from the record, and (3) attempted

to prevent other physicians from investigating and treating Mr. Smith's stroke. All three of these actions constitute dishonest, fraudulent conduct. PREVENTZA, by these actions, sought to minimize potential liability for herself, the BOV, UVA, and all other defendants in this case—thus decreasing financial losses and furthering the Kent Enterprise's financial goal of maximizing profit.

139.    PREVENTZA, DE LA CRUZ, and the Kent Enterprise regularly used electronic health records and internal email communications to execute this scheme of up-coding and liability-minimization. In so doing, they, alongside other members of the Kent Enterprise, transmitted fraudulent representations of patient risk and procedural complexity across state lines and to UVA's Atlanta-based financial center. As a result, thousands of patient bills were mailed from that location to federal payors, private insurers, and patients using CPT[12] codes and modifiers that misrepresented the medical necessity and complexity of the services provided. This constitutes an ongoing pattern of wire and mail fraud in violation of federal law. Additionally, the Kent Enterprise used the wires to transmit fraudulent medical information across state lines through the mobile care application MyChart. This also constitutes an ongoing pattern of wire and mail fraud in violation of federal law.

140.    When faculty or staff attempted to resist the Kent Enterprise's fraudulent practices by raising concerns about patient safety or trying to solve for the gross incompetence causing patient safety issues, Defendants routinely responded with threats, intimidation, and discipline designed to perpetuate the scheme and dissuade clinicians from reporting the fraud. KENT and KIBBE routinely accused those who spoke up of failing to be "team players." In one meeting, KENT openly declared his intent to "destroy the careers" of anyone who opposed their agenda and

---

[12] Current Procedural Terminology.

stated that he would recruit new physicians to enforce his directives and displace existing, highly regarded faculty. Over time, he followed through on that threat, posting job openings and hiring candidates for positions already held by some of the Physician Plaintiffs and others, who were at best intimidated into wondering whether their employment was safe and at worst, pushed out.

141.    TSUNG, Chair of Surgery, played a critical role in supporting the Kent Enterprise. TSUNG attempted to extort subordinates into furthering the Kent Enterprise by improperly threatening consequences for their failure to comply with the means of the conspiracy and support its goals; actively blocked faculty committees from investigating credentialing concerns; halted morbidity & mortality reviews into his co-conspirators; and facilitated sham disciplinary proceedings against whistleblowers. For example, (1) Dr. Jeffrey Young was forced to step down from his leadership roles after his objections to billing and staffing practices displaced his position to a new hire, thereby being constructively discharged; (2) Dr. Yount's continued employment became untenable when he was stripped of his authority and bypassed for promotion after reporting numerous instances of fraud; (3) Dr. Roeser was subjected to false "Be Safe" reports after reporting unsafe practices and was ultimately run out of Charlottesville; and (4) Dr. Kern was stripped of titles, administrative and leadership responsibilities, and participation in decision making after he raised fraud concerns.

142.    The Kent Enterprise's retaliation strategies were institutionalized. The UVA Affiliates weaponized their internal "Be Safe" reporting system—originally designed to improve systems and patient outcomes—to instead target whistleblowers. False reports were filed strategically to create a pretext for administrative discipline and to prevent the promotion of whistleblowers and others the Kent Enterprise wished to remove from the Entity Defendants. In a few cases, physicians were coerced into undergoing psychological evaluations and treatment, on

their own dime, after raising concerns, including about patient safety. Such retaliatory measures served to silence dissent and protect the Kent Enterprise leadership from accountability.

143.    Members of the Kent Enterprise systematically attempted to violate CMS billing regulations and co- and assistant surgeon codes (modifiers -62 and -82). PREVENTZA and DE LA CRUZ submitted claims for surgeries not performed jointly or without appropriate supervision and attempted to force others to do so too, including some of the Physician Plaintiffs herein. Residents were instructed to misrepresent the structure of procedures and PREVENTZA ordered them to perform procedures they had not yet been taught. Credentialing, privileging, and documentation related to the same were altered and falsified to increase billing.

144.    Upon information and belief, while the fraudulent schemes described in this Complaint were actively underway, the United States Department of Justice launched an investigation into unlawful billing practices and regulatory misconduct by UVA Affiliates and the Kent Enterprise. The timing of the investigation overlapped with the Kent Enterprise's ongoing implementation of revenue-maximizing fraud schemes, including improper coding, up charging, fraudulent use of modifiers, and systematic violations of healthcare regulations meant to protect patients and public resources. This investigation, which is ongoing, directly implicates members of the Kent Enterprise and their coordinated efforts to maximize revenue at the expense of lawful compliance and patient safety.

145.    In direct response to this escalating scrutiny, members of the Kent Enterprise undertook a coordinated campaign of obstruction and witness tampering aimed at insulating themselves from liability. These efforts included targeted acts of extortion, harassment, intimidation, coercion, and retaliation against employees and physicians suspected of cooperating with federal authorities. Physicians were threatened, surveilled, demoted, and isolated from

clinical and academic roles. Critical witnesses were replaced or constructively discharged. These actions were designed to suppress internal dissent, discourage disclosures of misconduct, and prevent individuals from testifying or supplying evidence in any official proceeding related to the federal investigation. These obstructionist tactics formed a central component of the Enterprise's broader strategy to preserve its control, conceal its illegal activities, and retaliate against anyone who stood in its way.

146.    Internal complaints and warnings went ignored or resulted in retaliation. Formal letters were sent to the highest levels of leadership including the BOV, the President of UVA, the CEO of UVAHS, and the University's General Counsel, outlining systemic patient safety failures, billing fraud, and retaliation. The letter written by Dr. Chris Ghaemmaghami, attached hereto as *Exhibit 2*, was the first, submitted to President Ryan after KENT was on site for only six weeks.

147.    Just over a year later, in September of 2021, the Chairperson of UPG wrote a letter of no confidence in KENT to the President of the University, Jim Ryan, and its Rector at the time, Whit Clement, also attached hereto, as *Exhibit 3*. On behalf of "fiduciaries of UVA Health;" those that "sit on UVA Health boards, . . . are UVA Health patients, . . . dedicated members of the Charlottesville community, . . . all [who] want to see UVA Health thrive . . . [and] [a]ll [who] have given our time to help UVA Health meet the needs of the UVA clinicians and nurses as well as the patients in the community," the Chairperson writes about KENT, "We have lost confidence in his ability to lead UVA Health, and we are here today to express a verbal vote of no confidence in Craig Kent."

148.    After meeting with Jim Ryan and Whit Clement in early October 2021, the Chairperson of UPG wrote a follow-up letter "to emphasize a couple of points and provide some context," not "to defend the status quo or complain about change. But [she wrote], I am concerned

about the current environment under Dr. Kent's leadership that has resulted in more and more talented physicians and nurses leaving and a decline in the quality and reputation of the healthcare provided at UVA."

149.    That letter concluded with a plea for the President and Rector to take some action. She wrote "This is the problem we keep facing. Dr. Kent says all the right things, but they don't translate into the right actions. At the same time that Dr. Kent emphasizes the importance of primary care, he is not supporting those very doctors here in Charlottesville. This is the story in many, many situations. I was hopeful at the very beginning. What Dr. Kent advocated sounded promising, but it's not what has happened. I am very sad about the state of UVA Health, however, I know that other than bringing these issues and the voices of the providers to your attention, I can't fix this, only you can."

150.    In another missive to the highest levels of leadership at the Entity Defendants, in August of 2024, an esteemed doctor with 30 years of service at the UVA Affiliates wrote to President Jim Ryan and then-provost Ian Baucom about the then-current leadership at the Health System level. His letter is attached hereto as *Exhibit 6*. He acknowledged that he has "served under and along with many Deans, Department Heads, Hospital and Health System leaders," and opined that "**[o]ur current senior leadership at the Health System level is the worst I have been associated with** . . . The current culture stands in opposition to foundational principles associated with academic medicine, including compassionate patient care, teaching, collaboration, transparency, respect and dignity." (emphasis added.) He went on, "**This is a closed, secretive, top-down group who manage by fiat, threat, intimidation, random and punitive demotions and firings, and suppression or delay of release of information or circumstances they deem unfavorable.** Data and statistics are massaged and gamed to make things appear positive, but it

seems that there has been an inexorable decline in quality, patient, and faculty/staff satisfaction." *Id*. (emphasis added.)

151.    In his letter to the President and Provost of UVA, this long-standing doctor advised leadership, "I lay this situation and culture directly at the feet of Dr Kent. He is known for retribution against those who speak out against his plans or approach, and has peopled his senior staff with cronies and former subordinates who are loyal to him and his way of doing things. It is widely believed that some of these positions have been filled without proper and transparent searches. Specifically, this pertains to the appointment of the current hospital CEO, a former subordinate colleague of Dr Kent's. The SOM Dean apparently served under Dr Kent as a Fellow during her training...unlikely coincidences, I think." He concludes with a prescient request for a vote of no confidence: "My prediction is that Dr Kent and many of his senior leadership group would not survive a no confidence vote from the Faculty if one was taken today. Perhaps we should find out . . . this is a unfortunate and regrettable situation that needs resolution promptly." *Id*.

152.    The letter-writing campaign to the highest levels of leadership at the Entity Defendants culminated in the September 5, 2024 Letter of No Confidence signed by 128 Entity Defendants-employed physicians who worked in departments throughout the UVAMC and sent to the Entity Defendants' leadership.

153.    The Letter of No Confidence, attached hereto as *Exhibit 7*, outlined several categories of failed systems and issues of threats to patient safety, asked for the resignation of KENT and KIBBE, and was the impetus for an independent investigation of the UVA Affiliates. Its contents are described more in depth in a section devoted to the Letter of No Confidence below.

154.    Even when confronted with the Letter of No Confidence signed by 128 of its employees, UPG remained silent and refused to support its physicians as they faced a coordinated

public relations attack by current and former members of the University, not to mention retaliation and retribution in their workplace. Indeed, even when UVA begrudgingly announced an internal investigation conducted by Williams & Connolly, UPG refused to provide any of its whistleblower physicians with legal counsel during the interviews. Instead, UPG remained silent. This only serves as further evidence of UPG's direct involvement in, and ratification of, the Kent Enterprise's actions and predicate acts.

155.    KENT, KIBBE, and HORTON functionally controlled UPG. UPG had full knowledge of the activities of the Kent Enterprise and, in fact, financially benefited from the fraudulent and illegal double-billing and up-coding, expansion of UVA into Northern Virginia markets, not to mention the falsification of patient data and risk scores which artificially inflated rankings and defrauded the government.

156.    UPG was never required to hire or retain any of the Kent Enterprise co-conspirators (e.g., TSUNG, PREVENTZA, and DE LA CRUZ) and it nevertheless did so despite actual knowledge of their dangerous incompetency, not to mention their proclivity to engage in fraud and other illegal acts. UPG, its employees, and its captured risk retention group Piedmont Liability Trust ("PLT") had full knowledge of what was going on with the Kent Enterprise but chose to continue to further the Enterprise's unlawful acts. UPG and PLT employees even openly referred to PREVENTZA as a "sociopath" yet they took no independent actions to curtail her fraud, her illegal acts, her reign of terror over peer physicians and residents/interns/fellows, or her endangerment of patients.

157.    Still, KENT, KIBBE, TSUNG, PREVENTZA, DE LA CRUZ, HORTON, and their unnamed co-conspirators remained in power. Even after she caused the death of a patient she had operated on, it was not until PREVENTZA was disallowed from working with any resident that

she finally left Entity Defendants. In final furtherance of the conspiracy as to PREVENTZA at the Entity Defendants, the internal investigation into PREVENTZA that was ongoing at the time she was let go was halted by the Kent Enterprise (e.g., by unprecedented direct interference in investigatory proceedings by UVA's General Counsel) with the result that she was never held accountable, and nothing about her behavior, the death she caused, or anything else related to the investigation ever made it into a public record. By resigning, PREVENTZA avoided any continuing investigation into her conduct, which in turn prevented the investigation from being reported to the National Practitioner Data Bank, where prospective employers could have learned about the gravity of the circumstances surrounding PREVENTZA's departure from the Entity Defendants. PREVENTZA was able to slink away from Entity Defendants without having to account for her behavior or the damage she had done, and future employers of PREVENTZA would never know what she did at the Entity Defendants.

158.    Upon information and belief, when PREVENTZA left UVA, she received a sizable settlement from the Entity Defendants and/or Virginia in taxpayer and institutional funds.

159.    Internal efforts to report these incidents through Entity Defendants' compliance channels were obstructed by high-level members of the Enterprise. In one instance, the Chief Compliance Officer failed to protect an internal whistleblower in the face of abundant evidence of an obvious campaign of deliberate retaliation for reporting coercion to commit fraud and for reporting patient safety concerns, instead reframing this campaign to the whistleblower as a "slap on the wrist." In another instance, UVA's designated compliance officer actively suppressed complaints related to PREVENTZA's conduct at the behest of the Enterprise, including an incident involving a first-year resident and PREVENTZA's patient Mr. Smith. PREVENTZA committed assault and battery on the resident by pushing her down into a chair to force her to write an order

for a medicine which multiple other physicians said would kill the patient. Even the pharmacy advised that it would not fill the prescription because it was contraindicated in the particular circumstance. Rather than escalating or formally investigating the matter, however, the compliance officer took steps to torpedo any internal review, preventing disclosure to federal authorities as required under mandatory reporting laws.

160.    With the help of the Kent Enterprise leadership, the compliance officer also deliberately slow-walked a separate internal investigation into DE LA CRUZ's conduct, including serious allegations of fraud and mistreatment of residents. By failing to escalate substantiated findings or report to external authorities, that compliance officer violated federal obligations for reporting patient safety events, falsification of records, and potential violations of the False Claims Act.

161.    The Kent Enterprise caused lasting harm, including patient deaths from complications tied directly to unsafe practices. Physicians who prioritized patient safety over profits, and who were leaders in their respective fields, were forced out, denied promotion, and blacklisted. The culture at the UVA Affiliates was transformed into one of fear, silence, and profiteering. All efforts to internally reform the system were crushed by a coordinated campaign of threats, retaliation, and fraud.

162.    The Physician Plaintiffs in this action, all of whom are highly reputable physicians, endured reputational harm, emotional trauma, and financial losses for doing what Defendants refused to do: stand up for patients and the institution.

*The Victims Left in the Wake of the Kent Enterprise*

**Patient Deaths – The Widows of Mr. Schumann and Mr. Smith**

163.    The wrongful deaths of patients Schumann and Smith were not isolated malpractice events, but the foreseeable and proximate result of the Kent Enterprise's racketeering conduct. KENT deliberately installed PREVENTZA and DE LA CRUZ in surgical leadership positions not because of their competence, but because they were unscrupulous actors willing to advance the Enterprise's unlawful revenue-generating practices, including upcoding, double-attending, misuse of billing modifiers, and suppression of dissent. In so doing, KENT ensured that the very individuals charged with performing complex life-saving procedures were unqualified to do so safely, yet could be relied upon to protect the scheme and silence opposition.

164.    The predicate acts of obstruction and witness tampering under 18 U.S.C. § 1512(b)–(d) are central to these outcomes. PREVENTZA and DE LA CRUZ did not merely mismanage patients; they preserved their positions through acts of tampering and obstruction, directing others to falsify or alter records, intimidating trainees, misleading colleagues, and concealing fatal errors. In the case of PREVENTZA, this included instructing a fellow to alter the record of a stroke patient by falsely attributing his deficits to "drug use." Such conduct, which falls squarely within § 1512(b)–(d), enabled these physicians to remain insulated within the Enterprise despite catastrophic patient outcomes, including preventable deaths.

165.    Had PREVENTZA and DE LA CRUZ not been placed by KENT in positions specifically designed to advance fraudulent billing practices and suppress dissent, they would never have performed the operations that killed Schumann and Smith. Their installation was not incidental but a deliberate component of the racketeering scheme: to entrench loyalists who would protect the Enterprise's fraud at any cost. The deaths of Schumann and Smith therefore represent

foreseeable consequences of the Enterprise's obstruction, fraud, and retaliation. The deaths of Schumann and Smith resulted directly from the Kent Enterprise's racketeering conduct, including acts of obstruction and witness tampering that enabled PREVENTZA and DE LA CRUZ to perform the procedures that caused their deaths.

**Dr. Jeff Young**

166.    Dr. Jeffrey S. Young is a nationally recognized trauma surgeon who joined the UVAMC in 1994. He has served as Director of the Trauma Center, a Professor in the UVASOM, Chief of the Compliance Office, and Patient Safety Officer for Defendants. He also holds a Master of Business Administration and has conducted trauma center inspections for the American College of Surgeons. Dr. Young's dedication to patient care and institutional integrity made him a target for retaliation when he raised concerns about fraudulent billing practices being implemented by the members of the Kent Enterprise.

167.    In June of 2022, Defendant TSUNG was appointed Chair of the Department of Surgery at UVAHS. Shortly thereafter, the department began shifting physician compensation exclusively to productivity metrics measured by Relative Value Units (RVUs), which incentivize volume and billing intensity over patient outcomes.

168.    Prior to this shift, the Entity Defendants employed a blended compensation model based on both RVUs and revenue-minus-expense sharing, known as CRP. Dr. Young opposed TSUNG's RVU-only model, particularly as it applied to trauma surgery, because it undervalued the critical and unpredictable nature of trauma care and created strong incentives for billing abuse.

169.    Dr. Young repeatedly reported his concerns regarding physician compensation to the Entity Defendants' leadership and staff, including via correspondence in which he objected to

pressure from leadership, including TSUNG, to increase RVUs through improper means, including aggressive coding and upcoding of services that did not meet billing criteria.

170.    Dr. Young was particularly concerned with the abuse of the CPT code 99291, a critical care billing code reserved for life-sustaining interventions such as mechanical ventilation, septic shock, or severe acidosis. He observed this code being used inappropriately and at a dramatically higher rate by intensive care physicians than trauma surgery physicians, despite not only comparable caseloads, but often the very same patients. Dr. Young noted that some of the intensive care physicians used the critical care billing code in intermediate care units contrary to the Centers for Medicare and Medicaid Services' (CMS) Regulations and Guidance.

171.    Shortly after he began questioning billing practices and raising fraud concerns, on July 1, 2023, Dr. Young was removed from his role as Division Chief of Acute Care Surgery, resulting in the loss of 10–20% of his UPG income.

172.    In a meeting on December 13, 2023, attended by senior leadership, Dr. Young voiced these concerns directly. The second half of the meeting was discreetly recorded by a meeting participant, in anticipation that the discussion would potentially veer into the discussion of billing fraud. During the meeting, Dr. Young advocated for a chart audit and stated that, if necessary, he would contact CMS to confirm billing guidelines.

173.    TSUNG rejected Dr. Young's concerns and dismissed his warnings that the billing practices could constitute fraud. The meeting at which these billing differences were discussed was not focused on improving billing accuracy or compliance but rather appeared intended to increase revenue by maximizing RVUs per TSUNG's physician compensation plan, regardless of medical necessity or accuracy. Rather than investigate why some departments, such as intensive

care, were billing more than they had in the past, TSUNG and the Kent Enterprise focused on strategies to repeat this pattern and increase billing in other departments.

174.    Dr. Young's ethical stance placed him at odds with leadership. He refused to manipulate billing codes and warned colleagues that to do so would be fraudulent. Despite his efforts to raise these concerns internally, no meaningful corrective action was taken.

175.    In January 2024, Dr. Young received a text from leadership requesting to speak about staffing and recruitment. During the resulting conversation, he was informed without any notice whatsoever that he would be replaced as Trauma Director—a role he had held for decades—as of August 2024. Leadership selected a less-qualified individual from outside of the organization to succeed him, bypassing more qualified internal candidates.

176.    This decision to replace Dr. Young, which Dr. Young was told was part of a "planned retirement," ignored his explicit plan to continue operating until 2027–2028, so he could work alongside his sons, both of whom were in surgical training.

177.    As a result of Defendants' conduct and the untenable work environment caused by the retaliatory reduction of his authority and support, Dr. Young gave notice of his resignation effective December 2024.

178.    Dr. Young's departure ended a 30-year career at UVA and prematurely ended his work with the American College of Surgeons, further compounding the personal and professional harm he suffered.

179.    Dr. Young's objections were never about money or personal advancement. He repeatedly expressed concern that RVU-driven billing distorted patient care priorities and encouraged coding practices that placed providers at risk of committing Medicare fraud.

180.    Dr. Young reasonably believed that the practices he observed, including improper use of the 99291 code, institutional pressure to code more aggressively, and manipulation of billing targets, all violated state and federal law, including at least the False Claims Act and the Virginia Fraud Against Taxpayers Act.

181.    For his efforts to prevent fraud and to protect the integrity of patient care and physician compensation, Dr. Young suffered adverse employment actions including loss of titles, constructive discharge, and reputational harm, all of which were causally linked to his protected activity.

182.    These actions were not isolated administrative decisions but were taken by Defendants acting in concert as part of an enterprise designed to prioritize fraudulent revenue generation and suppress dissent.

183.    Dr. Young also experienced significant emotional and psychological distress, including anxiety, loss of professional identity, and profound moral injury from being forced to choose between his ethical obligations and his continued employment.

184.    Defendants' treatment of Dr. Young was part of a larger pattern of intimidation, retaliation, and financial coercion against physicians who refused to engage in or remained silent about the fraudulent billing practices that fueled the scheme.

**Dr. Kenan Yount**

185.    Dr. Kenan Yount joined the Entity Defendants in 2018 as a faculty member and an adult cardiac surgeon, having completed his training with the UVA Affiliates. He quickly became a respected member of the cardiac surgery division, was its busiest surgeon, and was eventually elected by his peers to serve on the Faculty Senate, where he represented faculty during a period of increasing institutional dysfunction and administrative consolidation.

186.    From the outset of his employment with the Entity Defendants, Dr. Yount demonstrated a strong moral compass, a commitment to patient safety, surgical excellence, and an ability to collaborate with his colleagues. He actively worked to improve ICU practices at the UVA Affiliates and helped structure surgical rounding protocols during a period of high turnover and administrative instability. In light of the persistent problems among ICU leadership, he frequently had to facilitate and participate in consulting reviews commissioned by leadership. His efforts were well-received by many of his peers.

187.    Dr. Yount's initial concerns with the Kent Enterprise had to do with its development and implementation of what was internally referred to as the "Bridge Plan." Devised by KENT and executed through his subordinates, TSUNG and KIBBE, the Bridge Plan sought to centralize control of the UVA Affiliates' surgical service lines, removing operational autonomy from divisions such as cardiac surgery and placing them under the control of the Department of Surgery. The plan was driven by a cost-saving agenda and an arbitrary mandate for 20+% cardiac surgical growth year-over-year, despite obvious limitations in operating room capacity and staffing. The Bridge Plan not only imposed undue pressure on surgeons to increase revenues and cut costs, but it was unsafe.

188.    The Bridge Plan forced cardiac surgeons to share operating rooms and other significant resources with surgeons in unrelated specialties, including breast and colorectal surgery, whose instrumentation, workflows, and procedures were incompatible with those used in cardiac operations. Dr. Yount and several of his colleagues raised repeated and well-substantiated concerns that such practices compromised patient safety and introduced unacceptable risks. Their objections were dismissed by the Kent Enterprise, who prioritized operational metrics over patient outcomes. In fact, the prior Chief of Cardiothoracic Surgery resigned in 2020 after Dr. Kent refused

64

to address these issues. Dr. Yount was targeted and retaliated against for voicing his opposition to unsafe and unethical practices, and for reporting to various higher-ups.

189.    In one call fairly early on, KENT angrily questioned why "all the cardiac surgeons have not been fired," making plain the Kent Enterprise's zero-tolerance policy for internal resistance. This remark reflected the broader pattern of coercion and professional sabotage used to maintain loyalty and suppress accountability.

190.    Dr. Yount's reporting to higher-ups included complaints pertaining to PREVENTZA, who, though credentialed and privileged in July of 2023, did not perform an operation as the primary surgeon until October of 2023.

191.    In August of 2023, PREVENTZA stood in on one of Dr. Yount's surgeries; a surgery that also contained a cardiologist and resident who, unlike PREVENTZA, was actively helping Dr. Yount perform the procedure. Billing rules allow billing for "qualified residents," so Dr. Yount included the resident in his billing records to the exclusion of PREVENTZA, who did not help during the operation. Following the surgery, PREVENTZA attempted to extort Dr. Yount to include her on the surgical record as having participated in the surgery, despite having done nothing to assist with the procedure. Dr. Yount refused—because what PREVENTZA was asking him to do was billing fraud—and reported the incident to TSUNG and departmental administrative leadership.

192.    On October 4, 2023, in a trial protocol that PREVENTZA was not approved for, and for which, once again, there were already a cardiologist and qualified resident in the operating room helping, PREVENTZA sat in for training. Later in the day, during a discussion relating to Dr. Yount's salary, PREVENTZA attempted to extort Dr. Yount when she told him "if I help you with this [raise], I want your loyalty." She ended the conversation by asking Dr. Yount to include

her in the surgical record of the case earlier in the day, this time as the primary surgeon, because for privileging purposes she needed to be able to report that she had performed a surgery. Again Dr. Yount refused and again PREVENTZA persisted in pressuring him, subsequently texting him that evening, asking him to change the operative report to reflect that she was the primary surgeon. *Exhibit 11*.

193.    Although PREVENTZA had ninety days to meet her five-surgery requirement, she was unable to do so within that time and received an additional ninety-day extension. This was despite repeated efforts by the other cardiac surgeons in the department, including Dr. Kern, to encourage PREVENTZA to become more engaged in patient care and performing operations. In at least one instance, PREVENTZA refused to operate on a patient because she did not have the correct instruments. Notably, for many surgeons, performing <u>thirty</u> surgeries over the course of ninety days would be considered a relatively low case load. However, PREVENTZA needed Dr. Yount to give her one of his surgeries so that she could satisfy her <u>five</u> surgery credentialing requirements. In other words, PREVENTZA attempted to extort Dr. Yount, one of her subordinates, into falsifying medical records so that she might reap a material benefit: medical credentials she had not earned. PREVENTZA was a member of the Kent Enterprise who had been placed into a key, strategic position. Therefore, the existence of her medical credentials was critical to the success of the Kent Enterprise; conversely, the Kent Enterprise's interests would have been jeopardized had she lost her credentialing.

194.    Despite PREVENTZA's blatant efforts to coerce Dr. Yount to forge the surgical records and the direct threat to Dr. Yount of losing his superior's support for promotion and a raise in salary, Dr. Yount steadfastly refused to change his operative reports, knowing, among other things, that a change in the reports could create an enormous liability. Instead, in the interest of

patient safety, Dr. Yount reported PREVENTZA's avoidance of surgeries and efforts at extortion to certain members of the Kent Enterprise, including TSUNG. TSUNG responded by cautioning Dr. Yount that KENT and KIBBE were well-connected leaders and that crossing them could be "not pleasant."

195.    Despite Dr. Yount's prior reports concerning PREVENTZA going unaddressed, on October 11, 2023, he attended a faculty meeting with four other cardiac surgeons and TSUNG and PREVENTZA. During the meeting, PREVENTZA knowingly made a false statement, claiming she had communicated with a physician attempting to schedule a procedure that required a cardiac surgeon to be present in case of complications. The most senior surgeon present, Dr. John Kern, directly confronted TSUNG and PREVENTZA, pointing out the false statement and declaring that PREVENTZA's conduct was "wrong," and promptly walked out of the meeting. Presuming the meeting had effectively ended, Dr. Yount and the remaining surgeons also left.

196.    Witnessing that TSUNG had perverted the faculty's concerns by failing to acknowledge PREVENTZA's repeated misrepresentations, coercion, and extortion and instead alleging insufficient faculty support of PREVENTZA as a failure to uphold the institution's ASPIRE values, Dr. Yount immediately contacted the UVAHS's Chief Corporate and Compliance Officer. He met with the Chief Compliance Officer and reported all of PREVENTZA's attempts to coerce him, as well as TSUNG's behavior, in an in-person meeting. Dr. Yount provided her with detailed documentation of his concerns and a list of witnesses to interview. Later in the day, the Chief Compliance Officer called Dr. Yount and said that his concerns were being addressed, but she did warn him that unfortunately, in a meeting with UVAHS senior leadership, the UVAMC Chief Medical Officer, Reid Adams, and TSUNG openly speculated that Dr. Yount had made the report to Compliance.

197.    The next evening (October 14, 2023), TSUNG came into Dr. Yount's office, screamed at him, verbally abused him, and threatened to derail his career and box him out of a productive clinical practice by hiring other surgeons in Dr. Yount's subspecialty at UVA. TSUNG also stated that KENT and KIBBE could derail his job opportunities elsewhere because they were powerful and connected. (Of note, TSUNG immediately made similarly menacing threats to Dr. Kern via phone call that same evening, described below). Dr. Yount reported TSUNG's behavior directly to the Chief Compliance Officer.

198.    Within one week of the October 11, 2023 meeting, two jobs were posted matching Dr. Yount's and his partners' job descriptions.

199.    Within two weeks of the October 11, 2023 meeting, each of the cardiac surgeons who had attended the meeting were individually called into a purposefully intimidating "five-on-one" meeting with members of the Kent Enterprise, including KIBBE, HORTON, and TSUNG, and two additional senior officials, Reid Adams (Chief Medical Officer of UVAMC) and Susan Pollart (Senior Associate Dean for Faculty Affairs at UVASOM). During these meetings, the cardiac surgeons each were shown the seven policies they were told they had violated by walking out of that meeting with their Cardiothoracic Surgery Division Chief and Department of Surgery Chair and were forced to acknowledge that they had violated these policies before they were permitted to leave.

200.    In those five-on-one meetings, the members of the Kent Enterprise leading the meetings went so far as to directly threaten the surgeons that their clinical privileges would be revoked if such conduct were ever repeated—an assertion that was irrational on its face, as the purported policy violations had no conceivable connection to the surgeons' ability to provide safe and effective patient care. By equating these internal policy disputes with unfitness to treat

patients, Defendants published false and defamatory statements of fact that impugned the professional competence and integrity of these cardiac surgeons.

201.     Following the five-on-one meetings, each of the cardiac surgeons received a letter from KIBBE (the "Kibbe letter," the one sent to Dr. Yount is attached as *Exhibit 12*) describing what had happened in the October 11 meeting that the surgeons had left and the subsequent individual five-on-one meetings. The Kibbe letter outlined "a blatant act of defiance, insubordination, disrespectful behavior, unprofessional behavior, and a lack of accountability to authority. These actions are also concerning with respect to patient care, as oversight of the clinical mission is the responsibility of the chief and the Chair. With you demonstrating such blatant defiance and insubordination against both your chief and Chair, I have concerns that you may not follow requests that could impact the care of patients" and concluded, "[t]his letter will be part of your HR file." The letter was signed by KIBBE, and indicated that HORTON, TSUNG, Reid Adams, Susan Pollart, and Senior Employee Relations Consultant Carol Caesar received carbon copies. These letters were placed in these physicians' Human Resources files without following any typical steps or procedures (*e.g.*, The Department of Human Resources interviewing the physicians).

202.     The letters contained false information regarding the surgeons, because they did not intend to defy or disrespect TSUNG or PREVENTZA by walking out of a meeting they thought was over, and attributing patient care concerns to such behavior and publishing it to a third party was intentionally malicious and intended to intimidate. Clearly these letters were published to the third parties in the Human Resources department, and each time they came up in the Williams & Connolly interview process, or upon review of the doctors' HR files, they were republished to third parties.

203.    Dr. Yount drafted a response to the Kibbe letter he received, which is attached hereto as *Exhibit 13*. He did not send the letter because of his fear of retaliation, but it stands as his mental impressions at the time he received the Kibbe letter.

204.    Because of the existence of the Kibbe letter in Dr. Yount's HR file, he was refused promotion on the ordinary schedule and remained an Assistant Professor at a lower salary. Over the course of several months, Dr. Yount raised concerns through official and informal channels, including sharing the Kibbe letter and Dr. Yount's draft response with the Vice Provost for Faculty Affairs and finally lodging a complaint with a UVA Affiliates' Human Resources executive. The Vice Provost for Faculty Affairs counseled Dr. Yount that the Provost's office could facilitate a Human Resources investigation to address the academic aspects of his complaints but foreshadowed that KENT had sole jurisdiction over his clinical titles.

205.    Immediately following his formal interview with the Chief Human Resources Officer, John Kosky, during which Dr. Yount provided hundreds of pages of detailed documentation, Dr. Yount was invited to a meeting with four senior UVAHS officials. TSUNG, PREVENTZA, the UVAMC Chief Medical Officer and the UVASOM Surgery Chief Operating Officer were scheduled to attend the meeting. The stated purpose of the meeting was to discuss "changes in cardiac staffing." Dr. Yount reached back out to Kosky and the Provost's office and shared the invitation with them. Dr. Yount expressed his concern that this meeting would be KENT's follow-through of what the Vice Provost had foreshadowed (e.g., stripping him of clinical titles) and of TSUNG's previous threat to box him out.

206.    Within an hour of Dr. Yount's sharing the invitation with Kosky and the Provost's office, the meeting was abruptly canceled without explanation. Instead, the Defendants immediately announced the hiring of a new "Co-Director of Structural Heart," a role directly

overlapping with Dr. Yount's existing responsibilities. With the appointment of the new Co-Director of Structural Heart, Dr. Yount's title was unilaterally changed to "Valve Director," a demotion in scope and stature. Furthermore, the hire of DE LA CRUZ was announced one week later as well as his appointment as the "Co-Director of the Aortic Center," a position that Dr. Yount held at the time.

207.    Almost a year after the letter from KIBBE was placed in Dr. Yount's permanent HR file, on or about August 1, 2024, Dr. Yount received a letter from Provost Ian Baucom, attached hereto as *Exhibit 14*, referencing the Kibbe letter and describing it as a "letter of counseling" issued by KIBBE. Although this August 2024 correspondence permitted him to proceed with his promotion application and removed the Kibbe letter from his university HR file, the disciplinary language remained in his departmental record. This is just one example of a pattern of retaliatory documentation used to chill dissent and block the career advancement of whistleblowers.

208.    In light of the systematic scheme to increase revenue at the UVA Affiliates through acts of fraud and extortion, and the Kent Enterprise's coordinated effort to silence and suppress dissent in furtherance of the scheme, Dr. Yount was a signatory to the September 2024 Letter of No Confidence in Defendants KENT and KIBBE, which was signed by 128 Entity Defendants-employed physicians. In the aftermath of that letter, Dr. Yount was further marginalized within his department.

209.    The targeting of Dr. Yount cannot be divorced from the broader misconduct of the Kent Enterprise. His experience exemplifies the fate of those who chose to speak out against fraudulent billing practices, unsafe clinical conditions, and illegal governance structures. His experience is especially notable given that it illustrates a repeated and escalating pattern of unlawful retaliation against him for his legally protected activity, including retaliatory discipline,

retaliatory failure to promote, and other prohibited retaliatory penalties as a result of good faith reports of violations of federal and state law or regulations to supervisors, Compliance, and Human Resources and his refusal to perform actions that violated federal and state laws or regulations. Rather than rewarding integrity, the UVA Affiliates' leadership systematically punished it. Dr. Yount's professional trajectory—once ascending—was deliberately obstructed by actors whose primary interest was preserving a dangerous and unlawful enterprise.

210.     In July of 2025, Dr. Yount left his job with the Entity Defendants and moved his family to Florida.

**Dr. Mark Roeser**

211.     Dr. Mark E. Roeser is a distinguished pediatric and cardiothoracic surgeon who led the UVA Affiliates' lung transplant program during the COVID-19 pandemic and was the only surgeon performing complex "Berlin heart" procedures in the region. Despite his professional excellence and nationally funded research, Dr. Roeser was subjected to a campaign of retaliation, obstruction, and emotional abuse after he reported patient safety violations, hazardous operating room conditions, and fraudulent practices orchestrated by members of the Entity Defendants' leadership, including PREVENTZA and TSUNG.

212.     In the first instance of unwarranted punishment, Dr. Roeser faced false "Be Safe" reports from a pharmacist trainee and her supervisor who filed the complaints after he instructed the trainee to administer a critical, life-saving dose of medication to a newborn, and she delayed the delivery, putting the baby's life at risk. These reports were never meaningfully investigated; Dr. Roeser was never even questioned about them. They made their way to his permanent file, though.

213.    On September 27, 2024, while performing a complex adult congenital surgery, Dr. Roeser was pulled into an emergency situation in the cardiac catheterization laboratory (also known as the "cath lab") where a patient was coding[13] following a Transcatheter Aortic Valve Replacement (TAVR) procedure[14] performed by PREVENTZA the preceding day. The attending surgeon, PREVENTZA, was unreachable and failed to respond in a timely manner, and a trainee had been left alone in the cath lab with the dying patient, a gross violation of medical standards.

214.    Once PREVENTZA had finally been located, Dr. Roeser asked her "are you going to open this chest or am I?" In response, PREVENTZA walked out of the operating room, ostensibly to find the family to elicit their [unnecessary] consent. Dr. Roeser intervened with this dying patient, opened his chest and performed an emergency procedure, attempting to save the patient's life. Despite Dr. Roeser's best efforts, the patient died.

215.    After this tragedy, Dr. Roeser requested a formal mortality and morbidity (M&M) review and root cause analysis, which provoked backlash from TSUNG, PREVENTZA, and DE LA CRUZ.

216.    TSUNG attempted to block the M&M review and root cause analysis, but Dr. Roeser demanded that it proceed. The M&M meeting that followed was, according to Dr. Roeser, the "strangest M&M ever," during which discussion was stifled, and PREVENTZA's actions were ignored as TSUNG tried to quickly change subjects and move on before obtaining any clarity regarding the situation that had transpired or hold PREVENTZA accountable.

---

[13] "Coding" is a medical term that refers to a patient experiencing cardiac arrest.

[14] TAVR is a procedure to replace an aortic valve that is narrowed and does not open fully. The aortic valve is between the left lower heart chamber and the body's main artery. Narrowing of the aortic valve is called aortic valve stenosis. The valve problem blocks or slows blood flow from the heart to the body. *See* https://www.mayoclinic.org/tests-procedures/transcatheter-aortic-valve-replacement/about/pac-20384698

217.    Also after this tragedy, both PREVENTZA and DE LA CRUZ filed "Be Safe" reports against Dr. Roeser, falsely accusing him of bullying and inappropriate behavior for his insistence that someone step in to help the dying patient. At that time, DE LA CRUZ had more Be Safe complaints than surgeries.

218.    Because of the "Be Safe" reports filed against Dr. Roeser in this and the previous instance, his promotion was delayed because the Kent Enterprise had singlehandedly determined that it could change policy, processes, and procedures, and this policy change caused the punitive use of the Be Safe system to target whistleblowers instead of its intended use, which was to improve systems and patient outcomes.

219.    This was not the only time that Dr. Roeser was subjected to retaliation during his employ by the Entity Defendants. Previously, Dr. Roeser had been targeted by the Kent Enterprise after repeatedly voicing concerns about unsafe environmental conditions in the UVA Affiliates' operating rooms ("ORs").

220.    In the first instance, on September 9, 2024, during a pediatric surgery on a five-pound infant in an operating room referred to as OR 25, the room suddenly filled with chemical fumes, causing Dr. Roeser's surgical technologist (or "scrub tech") to lose consciousness and stop breathing, having to be rushed to the Emergency Room for treatment.

221.    Again, on September 17, 2024, OR 25 filled with fumes during another pediatric heart procedure, risking the safety of everyone in the OR, including the pediatric patient. Despite emails to the UVA Affiliate's Chief Medical Officer and other safety leaders, no action was taken.

222.    Finally, on November 5, 2024, similar fumes appeared, this time in OR 33. In response to this instance, with no further direction from members of the Kent Enterprise, Dr. Roeser instructed the anesthesiologist to call the fire department.

223.    Defendants took no meaningful corrective steps, failed to investigate the release of fumes properly, and continued using these unsafe ORs, placing patients and staff at risk. Management ignored Dr. Roeser's suggestions to reroute the HVAC system and silenced staff who raised concerns. Surgeons were forced to operate in dangerous environments or risk loss of income tied to surgical volume. The Entity Defendants' leadership failed to protect staff or disclose these hazards to patients or the public.

224.    Rather than address all of the serious concerns raised by Dr. Roeser over his time working for Defendants, Defendants punished him. TSUNG informed Dr. Roeser that he would not be promoted to Tenure because of his alleged violations of Defendants' aspirational ASPIRE values:

a.    Accountability: Acknowledging and assuming responsibility for where we have succeeded and failed in 2 terms of our actions, decisions, policies and results

b.    Stewardship: Managing our resources and commitment to continual improvement and learning responsibly and carefully while acknowledging shortcomings or problems in our quest

c.    Professionalism: Approaching all that we do in a collaborative way and delivering excellent care through the lens of helpfulness, positivity, kindness and competency

d.    Integrity: Being honest, open, and fair through our behaviors, attitude and treatment of others

e.    Respect: Valuing everyone through our compassionate and caring ways

f.    Equity: Fostering an environment of belonging that promotes justice, equity, diversity, inclusion, and unity throughout the organization and within the communities we serve.

225.    Even though there was no written policy or procedure for the ASPIRE values, including whether violating them warranted reprimand or punishment. Dr. Roeser was forced to delay his tenure application by a year to avoid further retaliation and was required to attend therapy sessions at his own cost, despite there being no finding of misconduct on Dr. Roeser's part.

226.    The consequences suffered by Dr. Roeser were devastating. He was forced to resign from the Entity Defendants, abandoning his $2.6 million NIH RO1 grant and his leadership of vital transplant programs. His career was derailed, his reputation damaged, and his personal life upended. He and his family, who had established deep roots in Charlottesville, were forced to move. His children were withdrawn from local schools, one with special needs requiring continuity in education and medical care. He suffered deep emotional distress, financial strain, and reputational harm. Despite his distinguished service, Dr. Roeser was treated as expendable for speaking up with the truth.

227.    The campaign against Dr. Roeser is part of a broader pattern of unlawful conduct and cover-up by senior officials of the Entity Defendants. PREVENTZA and DE LA CRUZ were routinely shielded from accountability despite incompetence and preventable patient deaths. Dr. TSUNG engaged in retaliation against multiple physicians who raised concerns. KENT, KIBBE, and other senior leaders such as HORTON knew of the deaths, billing abuses, and safety risks, but took no action, preferring instead to protect the Entity Defendants' image over their patients and physicians.

228.    Dr. Roeser's mistreatment, the retaliatory denial of his promotion, the unsafe operating room conditions, the fraudulent billing practices, and Defendants' failure to investigate serious misconduct all form part of the fraudulent and retaliatory Kent Enterprise described in this Complaint.

**Dr. John Kern**

229.    Dr. John A. Kern is a highly respected cardiothoracic surgeon who served Defendants for more than four decades, including as the current Surgical Director of the Heart and Vascular Service Line and Chief of the Cardiothoracic Surgery Division of the Department of Surgery. Dr. Kern has been on the faculty at the UVASOM and UVAHS since 1998 as a Professor of Thoracic and Cardiovascular Surgery, advancing from Associate to Assistant to Full Professor with Tenure; has been the Program Director for the UVA Cardiothoracic Surgery Program through the Accreditation Council for Graduate Medical Education for fourteen years (winning the Thoracic Surgery Residents Association's illustrious Socrates Award for Cardiothoracic surgery education); and has been the Stanton P. Nolan Professor of Surgery at the Entity Defendants for approximately ten years. Dr. Kern has received innumerable honors and awards over the years, including, to name just a few, Newsweek Magazine's #7 Cardiothoracic Surgeon in the United States; a Virginia Business Magazine's Top Cardiothoracic Surgeon; UVAHS's Dean's Master Clinician and Top Performer in Patient Satisfaction Awards and Central Virginia Magazine's Best Bedside Manner Award. Division Chief of Thoracic and Cardiovascular Surgery, Co-Director of the Heart and Vascular Service Line, and, for the past fourteen years, Program Director of the Graduate Medical Education Committee's residency program at UVASOM. He helped train generations of residents and fellows and is widely regarded for his integrity, patient care, and mentorship. Dr. Kern is one of the highest producers in the Department of Surgery and remains clinically active and academically engaged.

230.    Dr. Kern saw the retaliatory effects of the Kent Enterprise from the very start of KENT's reign, when one of the individuals at the very top of the prior leadership team disagreed with KENT in a public forum. That individual was told "if you ever disagree with me in public

again, you're out of here," and thereafter found himself without a job almost immediately. This was Dr. Kern's first sense that the culture at the Entity Defendants was going to change radically.

231.    In 2023, the Department of Surgery underwent significant leadership changes when a search for a Chief of the Division of Cardiothoracic Surgery in the Department of Surgery was begun. The search was quickly narrowed as the top picks chose not to take the job with Defendants. Finally, PREVENTZA remained as the sole candidate.

232.    During a telephone interview between Dr. Kern and PREVENTZA, PREVENTZA told Dr. Kern of her plan for double-attending scrubbing (using modifier -62 or -82) on operative cases as a way to increase revenue. Dr. Kern reminded PREVENTZA that the UVA Affiliates have a residency program that is approved by the Accreditation Council for Graduate Medical Education, and double-scrubbing to the exclusion of providing experience to the residents would not be good for the residents' education.

233.    Dr. Kern reviewed PREVENTZA's case lists from her former employer and found that she had very few surgeries as primary solo surgeon, and that most of her surgeries had been assisting her senior partners. Later in time Dr. Kern became aware that PREVENTZA had falsified information on her application for a Texas state medical license regarding the fact that she was placed on academic probation while in residency training.

234.    Dr. Kern considered the search that led to the hire of PREVENTZA to be an inappropriate, flawed search. They were looking for a big name and PREVENTZA was not that, though she had worked for a big name at Baylor.

235.    Like many of his colleagues in the Division of Cardiothoracic Surgery, Dr. Kern relayed his concerns about PREVENTZA to TSUNG before her hire. However, despite vocal

concerns from nearly all of the existing cardiac surgery faculty, PREVENTZA was hired as Division Chief of Cardiothoracic Surgery.

236.    Upon her arrival at the Entity Defendants, PREVENTZA quickly created a culture of retaliation, hostility, and billing abuse, the likes of which Dr. Kern had never seen during his more than four decades working for Defendants.

237.    In July and August of 2023, Dr. Kern tried to incorporate PREVENTZA into their cardiac surgery team, but PREVENTZA was always "in meetings."

238.    When she did reluctantly start to observe cardiac surgeries, PREVENTZA insisted she be included in billing records under circumstances where she was merely observing a surgery or in a surgery that did not require an assistant surgeon. These arrangements were orchestrated for the sole purpose of allowing PREVENTZA to either bill as a co-surgeon using modifier -62, or as an assistant using modifier -82, even when not clinically necessary. This practice increased RVU output and billing reimbursements while misrepresenting the medical necessity of dual attendance and violated Virginia state laws and Medicare billing regulations and federal healthcare program rules.

239.    Dr. Kern publicly objected to this fraudulent billing scheme and raised concerns internally. Rather than investigate or address his concerns, the Entity Defendants' leadership, acting under the direction of KIBBE, TSUNG, PREVENTZA, and HORTON, began systematically stripping Dr. Kern of his administrative and leadership responsibilities. Despite his seniority and track record, he was excluded from decision-making, bypassed for clinical scheduling, and isolated professionally.

240.    In late August of 2023, Dr. Kern sat down with TSUNG to relate his concerns about PREVENTZA's lack of engagement, her insistent plans of double attending scrubbing, and her

unwillingness to help out with inpatient consults needing surgery. TSUNG was dismissive, telling Dr. Kern that she was just new, and building the program.

241.    In this climate of animosity, TSUNG also told Dr. Kern in this meeting that he is a vindictive person who does not forget easily, so if anyone called him out in meetings or embarrassed him, he would retaliate.

242.    Dr. Kern was also vocal about broader concerns with the culture of fear and suppression taking hold under the new leadership. He observed the silencing of junior faculty, the unexplained departure of highly competent surgeons, and the use of compensation and scheduling to punish dissenters and reward loyalty to the fraudulent Kent Enterprise. His attempt to protect colleagues and patients ultimately made him a target.

243.    On October 11, 2023, Dr. Kern was the senior surgeon in the faculty meeting with four other cardiac surgeons and TSUNG and PREVENTZA.  During that meeting, Dr. Kern stated that PREVENTZA had made a false statement when she claimed she had communicated with a physician attempting to schedule a procedure that required a cardiac surgeon to be present in case of complications. Dr. Kern declared that PREVENTZA's conduct was "wrong," and walked out of the meeting.

244.    A day or two after the October 11 meeting, in a telephone conversation with Dr. Kern, TSUNG threatened the future careers of Dr. Kern and his cardiac surgeon colleagues at alternative institutions, saying to Dr. Kern if any of them began looking for other jobs, "Chairmen talk to each other."

245.    Following that telephone conference with TSUNG, Dr, Kern, like Dr. Yount and the two other cardiac surgeons who were present at that meeting on October 11, was subjected to an intimidating five-on-one meeting in front of KIBBE, HORTON, TSUNG, and two others in

leadership, during which he was forced to admit that he had violated numerous policies of Defendants. Dr. Kern was told to support PREVENTZA no matter what, and KIBBE asserted that PREVENTZA will be the busiest heart surgeon at UVA—despite the fact that Dr. Kern had repeatedly raised concerns about PREVENTZA's lack of engagement with the cardiac surgery section. Later, after Dr. Kern's five-on-one meeting, he received a letter from KIBBE substantively the same as the one received by Dr. Yount (the Kibbe letter to Yount is attached hereto as *Exhibit 12*), outlining exactly what he had done wrong and which policies he had violated, and relating that the letter was to remain in his HR file. That letter, attached hereto as *Exhibit 15*, contains Dr. Kern's handwritten contemporaneous mental impressions.

246.    On June 6, 2024, Dr. Kern pointed out the absurdity of the letter in a note to Human Resources: "John, please see the attached result of the special review of our CT residency by our GME, which resulted from concerns of our residents. I think this pretty much frames my frustrations, which were evident by October of last year, that led me to walk out of that meeting. I find it absurd that I have a letter in my HR file for an ASPIRE code violation, and was threatened the way that I was by the Dean, for walking out of a meeting, yet this behavior by our division chief has been enabled and tolerated for as long as it has been by our Chair and Dean." *Exhibit 16.*

247.    In October and into November of 2023, Dr. Kern, in his role as program director for the residency program at the UVA Affiliates, was approached by two of his residents who had both operated with PREVENTZA and who raised concerns about PREVENTZA's incompetence in the operating room. Dr. Kern told them that he had been "silenced by the Dean," but that they could open a complaint with the Graduate Medical Education office (the "GME"). The residents were reluctant to so complain, fearing that PREVENTZA would retaliate against them by interfering with their ability to secure employment after graduating their residency.

248.    The same residents returned to Dr. Kern in March and April of 2024 with the same concerns as well as additional professionalism concerns relating to PREVENTZA's abuse of the residents.

249.    Despite mentoring over 70 residents and fellows and having trained most of the cardiac surgical team at UVA, the new leadership attempted to push Dr. Kern's residency program aside in favor of a recruitment strategy designed to serve the financial and reputational goals of the Kent Enterprise, not the institution or patients. In late April, Dr. Kern met with his entire group of cardiothoracic residents at their request, because they were concerned about their surgical training and education. They had fears that the new leadership was demoralizing and driving people away who had specifically come to train at the UVA Affiliates and were worried that the double-scrubbing PREVENTZA advocated would severely limit their hands-on education.

250.    By late April and into early May, Dr. Kern got word that PREVENTZA had demanded that one of his residents falsify a patient's clinical record. The resident deemed the demand inappropriate.

251.    Also, by this time, Dr. Kern had raised his concerns about PREVENTZA and the culture of fear, retaliation, and bullying by senior leadership up the Entity Defendants' chain. He had spoken with TSUNG, the Vice Provost for Faculty Affairs, and the Chief of Human Resources Officer, and continued as time passed to update his reports with additional concerns. Ultimately, Dr. Kern met with the head of the GME program who finally had been approached by the cardiothoracic surgery residents with their concerns. Ultimately, no action was taken against PREVENTZA, despite mounting complaints, until the individuals with the least power—the residents—voiced their concerns to the GME.

252.    The head of the GME reported to Dr. Kern that the extensive list of concerns of the residents included "Complaints or evidence of inadequate supervision," "Reports of learner mistreatment," and "Repeated patterns of unprofessional behaviors involving trainees (by or against)." He also related that the GME program immediately had begun a "Special Review" of the residency program in the Division of Cardiothoracic Surgery.

253.    In early June of 2024, the preliminary results of the GME Special Review were released and by October, the final report, attached hereto as *Exhibit 17*, was out. PREVENTZA was removed from the GME program—prohibited from working with any residents—for a period of 12 months.

254.    In the meantime, PREVENTZA informed Dr. Kern of the hire of DE LA CRUZ. Dr. Kern was baffled by the hire of DE LA CRUZ, as he received many unsolicited outside communications regarding DE LA CRUZ which brought into question the entire hiring and search committee process under the direction of KIBBE, and the due diligence and vetting procedures (or lack thereof) being performed by TSUNG. One of Dr. Kern's senior Cardiothoracic Surgery residents had significant moral distress being on call with DE LA CRUZ, who the resident reported was unsure of himself and unable to make independent decisions. Dr. Kern spoke with DE LA CRUZ's Chief at his former place of employment and was told "No one has confidence in him, and he is not a program builder," and that DE LA CRUZ had been asked to leave that hospital.

255.    By the end of 2024, Dr. Kern was exhausted by the culture of fear and retaliation. He experienced deep emotional distress, including anxiety, humiliation, and a profound sense of moral injury as he was forced to choose between continuing in an institution engaged in patient endangerment and illegal/unethical practices, or ending a career he had built over decades.

256.     Dr. Kern's experience was not an isolated personnel matter. It was part of a coordinated pattern of retaliation and suppression orchestrated by senior leadership, including KENT, KIBBE, PREVENTZA, and HORTON to silence those who questioned patient safety, unlawful billing practices and the misuse of public funds.

257.     As a direct result of Defendants' conduct, Dr. Kern suffered financial harm when he was forced to share cardiac cases with PREVENTZA and DE LA CRUZ, decreasing his incentive pay accordingly. Dr. Kern also suffered reputational damage and emotional distress. He brings this action not only to vindicate his rights but to expose and deter the Kent Enterprise that harmed him and others who attempted to uphold the law and protect patients.

***The Letter of No Confidence from 128 Physicians employed by Defendants, and Dr. Kent's Resignation***

258.     In direct response to mounting concerns from the Entity Defendants' faculty and staff, a letter of no confidence in KENT and KIBBE was signed and dated September 5, 2024, by 128 physicians employed in various departments by the Entity Defendants.[15]

259.     In February 2025, after a thorough external investigation into the letter's allegations, KENT resigned from his roles as Chief Executive Officer of the UVAHS and Executive Vice President for health affairs at UVA,[16] following a closed-door session of the BOV, during which findings from an investigation conducted by attorneys at the law firm Williams & Connolly LLP were presented.[17] Counsel for the Physician Plaintiffs here also submitted a report of their findings based on their participation in the investigation.

---

[15] UVA Faculty Letter of No Confidence in Craig Kent and Melina Kibbe (September 5, 2004), attached hereto as *Exhibit 7*).

[16] https://virginiabusiness.com/UVA-health-ceo-resigns-effective-immediately/#:~:text=The%20independent%20investigation%20followed%20a,%E2%80%9D

[17] https://www.cvilletomorrow.org/UVA-health-ceo-resigns-after-allegations-from-faculty/#:~:text=Craig%20Kent%2C%20CEO%20of%20UVA,the%20UVA%20School%20of%20Medicine

260.    The No Confidence Letter, addressed to the Entity Defendants' leadership, included detailed allegations against the Kent Enterprise similar to those outlined herein. Among the claims were assertions of the creation of a "culture of fear and retaliation," excessive executive compensation and spending, and decisions that compromised patient safety and institutional transparency.[18] The letter described how leadership imposed decisions on clinical and academic staff without faculty input, weaponized administrative systems such as the "Be Safe" reporting system and the ASPIRE values to punish dissent, and silenced whistleblowers who raised ethical or safety concerns. The five-page letter accuses KENT and KIBBE of fostering a negative work environment that compromises patient safety and "is contributing to an ongoing exodus of experience and expertise."[19]

261.    The letter outlined a litany of egregious conduct by KENT and KIBBE, including compromised patient safety, retaliation against faculty, hiring of dangerous and unqualified physicians, and the systematic weaponization of internal processes to silence dissent.[20] Faculty detailed how KENT and KIBBE pressured clinical staff not to report patient safety concerns, hired surgeons with known histories of integrity and performance issues, and undermined credentialing and quality review protocols to maintain control.[21] Faculty also described a "culture of fear and retaliation," where questioning leadership was met with threats, intimidation, and career sabotage.[22]

262.    Beyond patient care, the letter detailed how promotions and tenure decisions were manipulated as tools of retaliation; how academic standards were abandoned in favor of favoritism;

---

[18] *See Exhibit 7.*
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*

how spending on executive personnel ballooned while clinical staffing shortages worsened; and how Defendants failed to provide transparency on significant financial matters.[23] Specific allegations included altering graduate medical education reports, falsifying performance metrics, suppressing whistleblower complaints, and demanding changes to patient records to mask adverse outcomes.[24] The letter concluded by calling for the immediate removal of KENT and KIBBE, citing their conduct as an urgent threat to patients, the institution's mission, and public trust.

263.    In the aftermath of the September 2024 Letter of No Confidence, UVA leadership launched a deliberate media campaign aimed at discrediting the physicians who raised legitimate safety and governance concerns. Rather than engage with the substance of the allegations concerning retaliation, patient safety, and billing fraud, they emphasized that these physicians were "motivated by greed," accusing them of being "disgruntled" and advancing a "false narrative." Senior administrators, including President Jim Ryan and board members such as William Crutchfield Jr., publicly criticized the letter as unfairly tarnishing the reputations of respected leaders with statements like that the signatories "have besmirched the reputations of not just Melina and Craig" and "cast a shadow over the great work of the entire health system."[25] This orchestrated effort to delegitimize dissent reflects the scope of KENT's control over the Entity Defendants and leadership. The Enterprise's tactics to intimidate faculty, shift public attention away from the real issues, and protect the Kent Enterprise's self-interested agenda had become the modus operandi of the Entity Defendants.

264.    Despite the serious allegations raised in the Letter of No Confidence and the subsequent investigation conducted by the law firm Williams & Connolly LLP, Defendant KENT

---

[23] *Id.*
[24] *Id.*
[25] https://www.fiercehealthcare.com/providers/UVA-pushes-back-facultys-no-confidence-letter-naming-system-ceo-med-school-dean?utm (last viewed 8/29/25).

was not terminated or held publicly accountable for his role in the misconduct and institutional failures outlined above. Instead, UVA's leadership chose to allow KENT to resign quietly, shielding him from reputational and financial consequences. This "golden parachute" arrangement included a severance package and continued compensation, ensuring that KENT remained professionally marketable and did not suffer any material loss as a result of his actions. Rather than terminating him for cause, the Entity Defendants' decision to permit a voluntary resignation, coupled with his severance package, signals where the loyalty of the Entity Defendants truly lies: not with the physicians and staff who raised concerns to protect patients and taxpayers, but with those whose misconduct placed both at risk. This accommodation allowed KENT to avoid scrutiny while preserving his stature in the medical and academic community.

265.    While the Entity Defendants publicly stated that the external investigation did not find cause to take action on regulatory violations, it conceded that the report revealed "sufficient concerns about leadership and trust" to justify KENT's immediate departure.[26] The University of Virginia accepted his resignation following the Board briefing, thanked him for his service, and announced the installation of interim leadership.[27]

---

[26]

https://UVAmagazine.org/articles/UVA_health_ceo_resigns#:~:text=In%20a%20letter%20to%20the,%E2%80%9D;
[27] *See also*
https://UVAmagazine.org/articles/UVA_health_ceo_resigns#:~:text=Dr,a%20new%20one%2C%20Ryan%20wrote

**UVA Health CEO resigns, effective immediately**

Dr. Craig Kent was subject of 'no-confidence' letter from some staff in 2024

Kate Andrews  //  February 26, 2025  //  2 Minute Read

[28]

266.    The resignation of KENT was not a routine transition. It was a direct consequence of years of fraud, extortion, retaliation, and institutional breakdown under KENT's imposition of control. The faculty revolt and subsequent investigation confirmed the very abuses that the Physician Plaintiffs and others had long been raising, further substantiating the existence of the Kent Enterprise at the heart of this case.

***Defendants' Lack of Response Leads to Plaintiffs' Notice of Claims Letter to the Attorney General and Resignations of KENT, KIBBE, and HORTON***

267.    Following the resignation of KENT as Chief Executive Officer of the UVAHS and Executive Vice President for health affairs at UVA in February 2025, the institutional crisis at the UVA Affiliates continued to unfold. On April 29, 2025, counsel for the Widowed Spouse Plaintiffs delivered detailed notices of claims to the Virginia Attorney General, attached hereto as *Exhibits 18* (Schumann) and *19* (Smith), informing the Commonwealth of the Widowed Spouse Plaintiffs' intent to file suit based on the misconduct of the Entity Defendants' leadership. On June 26, 2025,

---

[28] https://virginiabusiness.com/UVA-health-ceo-resigns-effective-immediately/ (last accessed 8/6/2025).

counsel for the Physician Plaintiffs delivered a detailed notice of claims to the Virginia Attorney General, attached hereto as *Exhibit 20,* informing the Commonwealth of the Physician Plaintiffs' intent to file suit based on the misconduct of the Entity Defendants' leadership. Consistent with the present Complaint, the Notices outlined patterns of fraud, retaliation, mismanagement, and patient harm that comprise the Kent Enterprise.

268.    Soon after the delivery of Notice, the Entity Defendants announced the resignations of two additional high-level officials and integral members of the Kent Enterprise, Dean of the UVASOM KIBBE and UVAMC CEO HORTON.



29

[29] https://www.modernhealthcare.com/providers/mh-UVA-health-wendy-horton-melina-kibbe/ (las accessed 9/24/25)

269.    KIBBE's resignation was publicly reported by the Entity Defendants on July 10, 2025. In the official announcement, KIBBE said she planned to "step away from her role to focus on professional and personal opportunities." However, her departure came on the heels of widespread internal opposition to her leadership, including the September 2024 Letter of No Confidence signed by 128 UVA physicians and her direct involvement in many of the retaliatory actions outlined in this complaint.

270.    HORTON also quietly stepped down from her role as CEO of the UVAMC. Although Defendants did not publicly announce her resignation with a formal statement, multiple internal sources confirmed that HORTON was no longer serving in her leadership role by mid-2025. Unsurprisingly, her departure closely followed that of KENT, with whom she had worked closely to implement the "Bridge Plan" and other operational policies now under scrutiny as a major part of the Kent Enterprise. HORTON was also referenced by name in the September 2024 Letter of No Confidence and in multiple physician interviews as a key figure involved in suppressing complaints about quality and safety.

## CAUSES OF ACTION

### COUNT 1

### RACKETEERING AND CORRUPT ORGANIZATIONS ACT
### (Violations of 18 U.S.C. § 1962(c))
*By All Plaintiffs*

271.    This count sets forth a claim for damages by the Plaintiffs against Defendants KENT, KIBBE, TSUNG, PREVENTZA, DE LA CRUZ, the Rector and Visitors of UVA, UPG, and the Commonwealth of Virginia for violations of the Racketeering and Corrupt Organizations Act, 18 U.S.C. §§ 1961, et seq.

272.    The allegations of the preceding paragraphs are incorporated herein by reference.

273.    KENT and KIBBE, with the assistance of other defendants including but not limited to HORTON, TSUNG, PREVENTZA, and DE LA CRUZ, the Rector and Visitors of UVA, UPG, and the Commonwealth of Virginia constituted an "enterprise" as defined by 18 U.S.C. § 1961(4), which engaged in, and whose activities directly affected, interstate commerce.

274.    This "Kent Enterprise" is a continuing criminal enterprise with a common purpose to defraud the Federal Government and the Commonwealth of Virginia, to unlawfully increase revenues and national rankings at UVAHS, to retaliate against those who sought to expose the fraud, thereby enriching the members of the enterprise, and securing their positions of power and control over the Defendants.

275.    The Kent Enterprise engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5). The predicate acts of racketeering included, without limitation:

a.    Multiple acts of mail fraud, in violation of 18 U.S.C. § 1341;

b.    Multiple acts of wire fraud, in violation of 18 U.S.C. § 1343;

c.    Health care fraud/Medicare fraud, in violation of 18 U.S.C. § 1347;[30]

d.    Extortion, in violation of Virginia Code Annotated §§ 18.2-59 and 18.2-26(3); and

e.    Obstruction of justice and witness tampering, in violation of 18 U.S.C. § 1512(b)–(d), by knowingly using intimidation, threats, corrupt persuasion, misleading conduct, and harassment to prevent Plaintiffs and others from testifying, producing documents, or reporting Defendants' unlawful conduct.

276.    All predicate acts were related, continuous, and carried out in furtherance of the fraudulent scheme to increase revenues and minimize financial losses, including concealing unlawful billing practices, obstructing investigations, falsifying medical records, and silencing

---

[30] Although health care fraud under 18 U.S.C. § 1347 is not itself enumerated as a RICO predicate act under 18 U.S.C. § 1961(1), the conduct alleged here constitutes racketeering activity because the fraudulent schemes to obtain Medicare and Medicaid reimbursements were executed through the use of interstate mail and wires. *See* 18 U.S.C. § 1343. Plaintiffs, therefore, plead these acts as mail and wire fraud predicates under RICO.

Plaintiffs from exposing the Enterprise's fraud and misconduct, all of which occurred at the cost of patient safety.

277.     The predicate acts that directly and proximately caused Plaintiffs' injuries include, in particular, violations of 18 U.S.C. § 1512(b)–(d), through which Defendants intimidated, threatened, and harassed Plaintiffs, altered and concealed evidence, and obstructed official proceedings, and extortion, in violation of Virginia Code Annotated §§ 18.2-59 and 18.2-26(3).

278.     As a direct and proximate result of the Defendants' pattern of racketeering activity, Plaintiffs have suffered injury to their business and property within the meaning of 18 U.S.C. § 1964(c), including but not limited to loss of employment, loss of earnings, destruction of professional opportunities, reputational and professional harm, and out-of-pocket expenses.

279.     Plaintiffs are entitled to treble damages, costs, and attorneys' fees as provided by 18 U.S.C. § 1964(c).

## COUNT 2

### RACKETEERING AND CORRUPT ORGANIZATIONS ACT (CONSPIRACY)
### (Violation of 18 U.S.C. § 1962(d) / Conspiracy to Violate 18 U.S.C. § 1962(c))
*By All Plaintiffs*

280.     The allegations of the preceding paragraphs are incorporated herein by reference.

281.     KENT and KIBBE, with the assistance of other defendants including but not limited to HORTON, TSUNG, PREVENTZA, DE LA CRUZ, and their unnamed co-conspirators, along with the Rector and Visitors of UVA, UPG, and the Commonwealth of Virginia, conspired to violate 18 U.S.C. § 1962(c).

282.     The Defendants created a combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means, resulting in damage to plaintiff.

283.    Defendants agreed to commit the predicate acts of fraud and extortion in furtherance of the Kent Enterprise's unlawful scheme.

284.    As a direct and proximate result of this conspiracy, Linda Schumann, Administrator of the Estate of Thomas John Schumann, deceased, has suffered injury to her business and property.

285.    As a direct and proximate result of this conspiracy, Carrie Finch-Smith, Administrator of the Estate of James Gordon Smith, deceased, has suffered injury to her business and property.

286.    As a direct and proximate result of this conspiracy, Dr. Young has suffered injury to his business and property.

287.    As a direct and proximate result of this conspiracy, Plaintiff Dr. Yount has suffered injury to his business and property.

288.    As a direct and proximate result of this conspiracy, Plaintiff Dr. Roeser has suffered injury to his business and property.

289.    As a direct and proximate result of this conspiracy, Plaintiff Dr. Kern has suffered injury to his business and property.

290.    Plaintiffs are entitled to treble damages, costs, and attorneys' fees as provided by 18 U.S.C. § 1964(c).

## COUNT 3

### FALSE CLAIMS ACT
### (Violations of 31 U.S.C. § 3730(h))
*By the Physician Plaintiffs*

291.    The allegations of the preceding paragraphs are incorporated herein by reference.

292.    Throughout their employment with the Entity Defendants, Plaintiffs were leaders in their respective fields, top performers, and the recipients of numerous accolades.

293.    As set forth above, Plaintiffs were harassed and suffered other forms of retaliation because of their lawful acts and efforts to stop what they reasonably and in good faith believed to be one or more violations of the False Claims Act.

294.    After becoming aware of fraudulent billing practices—including but not limited to improper use of co-surgeon and assistant surgeon billing codes (modifiers -62 and -82), upcoding of CPT code 99291 for non-critical care, alteration of credentialing documents, and forced and attempted participation in billing schemes. Plaintiffs reasonably and in good faith believed that such practices constituted violations of the False Claims Act.

295.    As a result of their reasonable, good faith belief that Defendants' actions were in violation of the False Claims Act, Plaintiffs refused to participate in the violations, publicly objected to the illegal activities, attempted to stop the activities, and reported the activities internally to senior UVA leadership, including but not limited to KENT, KIBBE, TSUNG, HORTON, the BOV, the Provost's office, and others in Human Resources and Compliance.

296.    These efforts on Plaintiffs' part were lawful and undertaken to stop Defendants' numerous violations of Medicare billing regulations, federal healthcare program rules, and other statutes and regulations enforced through the False Claims Act.

297.    Plaintiffs' objections—including those raised in formal meetings, recorded calls, internal letters, and direct complaints—put Defendants on notice that they could be subjected to litigation under the False Claims Act. Defendants were aware of Plaintiffs' efforts to halt fraudulent billing practices and prevent further violations.

298.    In retaliation for their efforts to stop the ongoing violations described above, each Plaintiff suffered retaliation: Dr. Jeffrey Young was removed from multiple leadership positions, including his long-held role as Trauma Director, and subjected to constructive discharge; Dr. Kenan Yount was demoted and replaced in his role without cause, received retaliatory documentation which permanently marred his employment record, was prevented from advancing his career, and was effectively forced out of his employment with the Entity Defendants; Dr. Mark Roeser was denied promotion, forced to delay tenure, falsely accused of misconduct, and ultimately forced to resign his position and abandon federal research grants; Dr. John Kern was stripped of leadership responsibilities, bypassed in clinical scheduling, and suffered emotional distress and reputational damage.

299.    These retaliatory acts caused substantial reputational, emotional, and financial harm to Plaintiffs and constitute violations of 31 U.S.C. § 3730(h).

## COUNT 4

### VIRGINIA FRAUD AGAINST TAXPAYERS ACT (RETALIATION)
### (Violation of Va. Code Ann. § 8.01-216.8)
*By the Physician Plaintiffs*

300.    The allegations of the preceding paragraphs are incorporated herein by reference.

301.    Plaintiffs, Dr. Young, Dr. Yount, Dr. Roeser, and Dr. Kern, each as employees of the Entity Defendants, and the Entity Defendants and the Commonwealth of Virginia, engaged in protected activity under the Virginia Fraud Against Taxpayers Act by undertaking lawful acts to stop one or more violations of the Act. Specifically, each Plaintiff raised internal concerns regarding fraudulent billing practices and systemic misconduct at the Entity Defendants that directly impacted the expenditure and claims of public funds in violation of Va. Code Ann. § 8.01-216.1, et seq.

302.    These protected activities included, but were not limited to, objecting to and reporting the misuse of co-surgeon and assistant surgeon billing codes (modifiers -62 and -82), upcoding of CPT code 99291 for critical care, billing under false credentials, improper documentation and credentialing to secure payments for unauthorized services, and pressuring surgeons to perform unnecessary or duplicative procedures to inflate case volume and revenue.

303.    Defendants KENT, KIBBE, TSUNG, PREVENTZA, DE LA CRUZ, HORTON and others in the Entity Defendants' leadership had knowledge of Plaintiffs' protected activity. Plaintiffs raised concerns directly to these individuals and to the Entity Defendants' internal HR, compliance, and administrative structures.

304.    In retaliation for their efforts to stop what they reasonably and in good faith believed to be violations of the Virginia Fraud Against Taxpayers Act, each Plaintiff suffered retaliation: Dr. Jeffrey Young was removed from multiple leadership positions, including his long-held role as Trauma Director, and subjected to constructive discharge; Dr. Kenan Yount was demoted and replaced in his role without cause, received retaliatory documentation which permanently marred his employment record, was prevented from advancing his career, and was effectively constructively discharged when he was forced out of his employment with the Entity Defendants; Dr. Mark Roeser was denied promotion, forced to delay tenure, falsely accused of misconduct, and ultimately constructively discharged when he was forced to resign his position and abandon federal research grants; Dr. John Kern was stripped of leadership responsibilities, bypassed in clinical scheduling, and suffered emotional distress and reputational damage.

305.    These retaliatory actions were taken because of Plaintiffs' protected activity and resulted in professional, reputational, and economic harm to each of them.

306.     Plaintiffs are entitled to all remedies available under the Virginia Fraud Against Taxpayers Act, including reinstatement, two times the amount of back pay, interest, and compensation for special damages, including litigation costs and reasonable attorneys' fees.

## COUNT 5

### VIRGINIA'S FRAUD AND ABUSE WHISTLEBLOWER PROTECTION ACT (RETALIATION)
### (Violations of Va. Code § 2.2-3011)
*By the Physician Plaintiffs*

307.     Plaintiffs incorporate by reference the allegations asserted above.

308.     Plaintiffs have been subjected to retaliatory actions for conduct as whistleblowers, which is protected under Virginia Code § 2.2-3011.

309.     Each Physician Plaintiff, in good faith and without malice, reported or attempted to report serious misconduct, fraud, and abuse of taxpayer-funded resources by officials at the Entity Defendants to persons and bodies within the University of Virginia, including internal compliance channels, Human Resources, direct supervisors, and senior administrative officers, including KENT, KIBBE, TSUNG, and HORTON.

310.     The Physician Plaintiffs' disclosures included concerns about fraudulent billing practices, false credentialing, unsafe operating room scheduling, retaliation against physicians raising safety concerns, and misconduct in the use of federal and state funds through improper billing and manipulation of records.

311.     KENT and KIBBE have been on notice since at least 2022 that Plaintiffs were protected whistleblowers under Virginia law. Their protected disclosures were made directly to Defendants and also were documented in internal complaints and statements to Defendants.

312.     In retaliation for their protected disclosures each Plaintiff suffered retaliation: Dr. Jeffrey Young was removed from multiple leadership positions, including his long-held role as

Trauma Director, and subjected to constructive discharge; Dr. Kenan Yount was demoted and replaced in his role without cause, received retaliatory documentation which permanently marred his employment record, was prevented from advancing his career, and was effectively forced out of his employment with the Entity Defendants; Dr. Mark Roeser was denied promotion, forced to delay tenure, falsely accused of misconduct, and ultimately forced to resign his position and abandon federal research grants; Dr. John Kern was stripped of his role as Co-Director fo the Heart and Vascular Service Line, administrative and leadership responsibilities, excluded from some of the decision making, and bypassed for clinical scheduling in favor of puppets of the conspiracy. These retaliatory actions all caused significant loss of earnings and emotional distress and reputational damage to the Physician Plaintiffs, as well as foreseeable harm to patients.

313.    These retaliatory actions were taken in violation of the Virginia Fraud and Abuse Whistleblower Protection Act and resulted in professional, reputational, emotional, and economic harm to Plaintiffs.

## COUNT 6

### NEGLIGENT HIRING AND RETENTION
*By the Physician Plaintiffs*

314.    Plaintiffs incorporate by reference all allegations set forth in the preceding paragraphs.

315.    The Entity Defendants and their governing officials were responsible for hiring and supervising senior executives, including but not limited to KENT (former Chief Executive Officer of the UVAHS and Executive Vice President for health affairs at UVA), KIBBE (former Dean of the UVASOM), HORTON (former CEO of the UVAMC), TSUNG (Chair of the Department of Surgery), and PREVENTZA (Chief of the Division of Cardiothoracic Surgery), and DE LA CRUZ.

316.    At the time of their hiring, the Entity Defendants knew or should have known through reasonable investigation and ordinary diligence that these individuals were unfit for their positions due to their history of retaliatory conduct, mismanagement, disregard for patient safety, and unethical leadership practices.

317.    For example, KENT had previously faced serious criticism at prior institutions, including documented issues at Ohio State University related to retaliation and abuse of authority. KIBBE's prior leadership controversies, including control issues, and disregard for dissenting voices, were well known among academic circles. The Entity Defendants' failure to investigate or heed warnings about these issues contributed directly to the harm suffered by Plaintiffs.

318.    Moreover, even after the hiring of KENT and KIBBE, the Entity Defendants continued to receive repeated internal complaints and warnings, including formal letters and HR reports, the Letter of No Confidence in KENT and KIBBE signed by 128 physicians, and widespread resignations of key faculty members that put them on notice of the danger these individuals posed to patient safety, ethical billing practices, and physician well-being. Even after all of these warnings, the Entity Defendants failed to take corrective action, and instead allowed these individuals to remain in their positions and continue engaging in retaliatory conduct, fraudulent schemes, and unsafe clinical policies.

319.    This failure to remove KENT, KIBBE, HORTON, TSUNG, PREVENTZA, and DE LA CRUZ, despite mounting evidence of misconduct constitutes negligent retention under Virginia law. The Entity Defendants' inaction, even after repeated instances in which Plaintiffs were led to believe that action would be taken as a result of their efforts to report their concerns internally, created an environment in which retaliatory firings, coerced resignations, patient harm, and billing fraud flourished unchecked.

320.    The harm to Plaintiffs, including reputational damage, emotional distress, lost income, loss of career advancement, and constructive discharge was a direct and foreseeable result of the University's negligence in hiring and retaining these individuals.

321.    The Entity Defendants' failure to timely and reasonably investigate these officials prior to hiring them, or to take appropriate action after repeated and credible warnings about their conduct, renders it liable under Virginia law for negligent hiring and negligent retention.

### COUNT 7

### DEFAMATION,- LIBEL, AND SLANDER
### (Violations of Va. Code § 8.01-45, et seq.)
*By Plaintiffs Dr. Yount and Dr. Kern*

322.    Plaintiffs incorporate by reference all allegations set forth in the preceding paragraphs.

323.    The Entity Defendants, through their agents acting in the scope of their employment, including but not limited to KIBBE, TSUNG, and HORTON, conspired to intentionally and maliciously publish false statements that called the fitness and integrity of Plaintiffs Dr. Yount and Dr. Kern into question and prejudiced them in their practice of medicine and in their ability to obtain promotions and advance their careers.

324.    In October 2023, Defendant KIBBE published false statements about Dr. Yount and Dr. Kern in letters that were circulated to high-ranking individuals employed by the Entity Defendants (including defendants HORTON and TSUNG). The Kibbe Letters were also published and maintained in Dr. Yount's and Dr. Kern's HR files.

325.    Dr. Yount's and Dr. Kern's Kibbe Letters stated: "As we discussed, your actions represented a blatant act of defiance, insubordination, disrespectful behavior, unprofessional behavior, and a lack of accountability to authority. These actions are also concerning with respect

to patient care, as oversight of the clinical mission is the responsibility of the Chief and the Chair. With you demonstrating such blatant defiance and insubordination against both your Chief and Chair, I have concerns that you may not follow requests that could impact the care of patients" and concluded, "[t]his letter will be part of your HR file." These statements falsely imply that Dr. Yount and Dr. Kern lacked the competence, integrity, and fitness to perform their duties and provide the highest standard of patient care. Such accusations are particularly ironic given that they were made in direct retaliation for Dr. Yount's and Dr. Kern's protected complaints about Dr. Preventza's pattern of incompetence, dangerous surgical practices, and fraudulent conduct. Rather than addressing the serious patient safety concerns that had been raised, the Enterprise weaponized HR letters to invert the truth, branding these respected surgeons as insubordinate and unprofessional when, in fact, they were fulfilling their ethical duty to speak out. By reducing their good-faith advocacy for patient safety to charges of 'defiance,' the Kibbe Letters not only punished them for whistleblowing but also inflicted reputational harm by suggesting they lacked the integrity and competence required to care for patients.

326.    These statements were false and defamatory. They directly impute to Dr. Yount and Dr. Kern a lack of competence, integrity, and fitness to perform their professional duties as surgeons. They are therefore defamatory per se within the meaning of Va. Code § 8.01-45 because they prejudice Plaintiffs in their profession, impute unfitness to practice medicine, and attribute want of integrity in the discharge of professional duties.

327.    Because the Kibbe letters were maintained in Dr. Yount and Dr. Kern's personnel files, these statements were republished each time those files were read by a third party, and they also prejudiced the doctors' ability to obtain promotions and advance their careers. For example, because the Kibbe letter was maintained in Dr. Yount's file, his application for promotion was

denied. For another example, on or about August 1, 2024, Dr. Yount received a letter from Provost Ian Baucom, attached hereto as *Exhibit 14*, in connection with Dr. Yount's application for a promotion. Baucom's letter referred to the Kibbe letter as a "letter of counseling," confirming that Baucom saw the Kibbe letter and the defamatory statements contained therein. Because

328.    Moreover, the Kibbe letters and their contents were republished to third parties each time they were raised during the Williams & Connolly interview process, which began in October 2024. Upon information and belief, KENT repeatedly negatively misrepresented the surgical abilities of the Physician Plaintiffs to board members within the Entity Defendants.

329.    These statements were made, circulated, and republished in bad faith. Defendants knew the accusations were false because they were made in direct retaliation for Plaintiffs' protected complaints about patient safety, misconduct, and billing practices, not based on any sincere concern for patient safety. Defendants acted with reckless disregard for the truth and with the intent to deliberately mislead others within the Entity Defendants, as well as prospective employers and promotion committees, about Plaintiffs' competence and integrity.

330.    The defamatory statements caused harm to Plaintiffs Dr. Yount and Dr. Kern, including professional and reputational damage, emotional distress, humiliation, embarrassment, lost income, and loss of career advancement.

331.    Entity Defendants, and Individual Defendants, including but not limited to KIBBE and HORTON, repeatedly, knowingly, and intentionally published the untrue statements about Plaintiffs Dr. Yount and Dr. Kern contained in the Kibbe letters, which harmed their professional reputations by imputing an inability and a lack of integrity in their performance of their duties, which renders Defendants liable for defamation under Virginia law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Linda Schumann, Administrator of the Estate of Thomas John Schumann, deceased; Carrie Finch-Smith, Administrator of the Estate of James Gordon Smith, deceased; Dr. Jeffrey S. Young, Dr. Kenan W. Yount, Dr. Mark Roeser, and Dr. John A. Kern, respectfully request that this Court enter judgment in their favor and against all Defendants, jointly and severally, and grant the following relief:

a.   An award of treble damages pursuant to 18 U.S.C. §§ 1964(c) and/or 1964(d) on the First and Second Counts (Civil RICO and Conspiracy to Violate RICO);

b.   An award of compensatory and special damages, including back pay, front pay, reinstatement (where appropriate), interest, and a civil penalty as permitted under the False Claims Act, 31 U.S.C. § 3730(h), on the Third Count;

c.   An award of compensatory and special damages, including back pay, double damages, interest, reinstatement (where appropriate), and attorneys' fees and costs under the Virginia Fraud Against Taxpayers Act, Va. Code § 8.01-216.8, on the Fourth Count;

d.   An award of compensatory and punitive damages, as well as reinstatement or other equitable relief, for retaliation in violation of the Virginia Fraud and Abuse Whistleblower Protection Act, Va. Code § 2.2-3011, on the Fifth Count;

e.   An award of compensatory and punitive damages for Defendants' negligent hiring and retention of unfit and dangerous employees under Virginia common law, on the Sixth Count;

f.   An award of compensatory and punitive damages for Defendants' Defamation, Libel, and Slander, Va. Code § 8.01-45, et seq., on the Seventh Count.

g.   An award of Plaintiffs' costs and reasonable attorneys' fees as permitted by applicable law;

h.  Such other and further relief at law or in equity as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby respectfully demand trial by jury on all issues and counts triable of right

before a jury.

Respectfully submitted,

**LINDA SCHUMANN, ADMINISTRATOR OF THE ESTATE OF THOMAS JOHN SCHUMANN, DECEASED, CARRIE FINCH-SMITH, ADMINISTRATOR OF THE ESTATE OF JAMES GORDON SMITH, DECEASED, DR. JEFFREY S. YOUNG, DR. KENAN W. YOUNT, DR. MARK E. ROESER, and DR. JOHN A. KERN,**

/s/ Les S. Bowers
By Counsel

Les S. Bowers (VSB No. 77840)
MICHIEHAMLETT, PLLC
310 4th Street N.E., 2nd Floor
P.O. Box 298
Charlottesville, Virginia 22902
P: (434) 951-7200
F: (434) 951-7256
lbowers@michiehamlett.com

Anthony M. Russell (VSB No. 44505)
MICHIEHAMLETT, PLLC
109 Norfolk Avenue S.W., 2nd Floor (24011)
P.O. Box 2826
Roanoke, Virginia 24001
P: (540) 492-5300
F: (540) 492-5400
ARussell@MichieHamlett.com

104

Gladstone N. Jones, III (LA Bar No. 22221)
Lynn E. Swanson (LA Bar No. 22650)
Thomas F. Dixon (LA Bar No. 38952)
**JONES SWANSON HUDDELL LLC**
601 Poydras Street, Suite 2655
New Orleans, Louisiana 70130
Telephone: (504) 523-2500
Facsimile: (504) 523-2508
gjones@jonesswanson.com
lswanson@jonesswanson.com
tdixon@jonesswanson.com

*Counsel for Plaintiff*