**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
CHARLOTTESVILLE DIVISION

CLERKS OFFICE US DISTRICT COURT
AT CHARLOTTESVILLE, VA
FILED
October 21, 2026
LAURA A. AUSTIN, CLERK
BY: /s/ Nik Sams
DEPUTY CLERK

DR. JEFFREY S. YOUNG, ET AL.,

*Plaintiffs*,

v.

RECTOR & VISITORS OF THE UNIVERSITY OF VIRGINIA, ET AL.,

*Defendants*.

CASE NO. 3:25-CV-00083

JUDGE NORMAN K. MOON

**MEMORANDUM OPINION & ORDER**

Plaintiffs Jeffrey Young, Kenan Yount, Mark Roeser, and John Kern—current and former employees of the University of Virginia ("UVA"), its medical school, and medical center—claim that Craig Kent ("Dr. Kent"), the former CEO of UVA Health System, and his leadership team demanded that physicians increase the cost of medical procedures through fraudulent billing practices. *See* Dkt. 150 (Second Amended Complaint). Plaintiffs, who are or were veteran surgeons at UVA, fought against these practices, which they believed were illegal and put patient lives at risk. Because of their opposition, Plaintiffs allegedly suffered harassment, threats of professional retaliation, disciplinary action, and demotion. They sued, and this Court has already resolved motions to dismiss their First Amended Complaint. Dkt. 148.[1] In its June 2, 2026 Memorandum Opinion and Order, this Court dismissed: (1) the Physician Plaintiffs' civil Racketeer Influenced and Corrupt Organizations Act ("RICO") and RICO conspiracy claims for failure to allege

[1] The Court fully recited the factual allegations underlying this action in its previous Memorandum Opinion and will not repeat them here.

statutory standing; (2) Dr. Roeser's False Claims Act ("FCA") and Virginia Fraud Against Taxpayers Act ("VFATA") claims because he did not allege he engaged in protected activity; (3) Drs. Young's, Yount's, and Kern's FCA and VFATA claims against Drs. Kent, Kibbe, Tsung, Preventza, and de la Cruz and Ms. Horton (collectively, the "Medical Leaders") because neither statute permits recovery against supervisors in their individual capacities; and (4) Drs. Young's, Yount's, Roeser's, and Kern's VFAWPA claims against UVA and UVA Physicians Group ("UPG") because those claims can only be brought against supervisors in their official capacities. *Id.*

However, the Court also granted Plaintiffs leave to file a Second Amended Complaint, *id.*, which they did, Dkt. 150. In the Second Amended Complaint—much like in the First Amended Complaint that the Court already dismissed—Plaintiffs assert four causes of action: (1) a civil RICO violation of the against all Defendants; (2) RICO conspiracy against all Defendants; (3) FCA retaliation against UVA and UPG; and (4) VFATA retaliation against UVA and UPG. Dkt. 150. Defendants again move to dismiss Plaintiffs' claims. *See* Dkts. 154, 156, 158, 160, and 163. This time, though, the parties have fully briefed UVA's sovereign immunity argument, Dkts. 158–159, 174, after completing jurisdictional discovery.

For the reasons that follow, the Court agrees that UVA is immune from suit and will therefore dismiss Count I through IV against UVA. The Court also agrees with the remaining Defendants that Plaintiffs still fail to allege statutory standing to assert their RICO claims. Therefore, Counts I and II against the Medical Leaders and UPG are also dismissed. That leaves two claims—the FCA and VFATA retaliation claims alleged in Counts III and IV—pending against UPG. Those claims (and only those claims) will proceed to discovery.

## I. LEGAL STANDARDS

### A. Fed. R. Civ. P. 12(b)(1)

A motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure challenges a court's subject matter jurisdiction. Challenges to jurisdiction under Rule 12(b)(1) may be raised as either "facial attacks" or "factual attacks." *Thigpen v. United States*, 800 F.2d 393, 401 n. 15 (4th Cir. 1986). No matter the type of challenge brought, the plaintiff "has the burden of proving that subject matter jurisdiction exists." *Evans v. B. F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999) (citing *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)). Here, UVA raises a factual attack, arguing it is immune from suit.

A factual attack challenges the complaint's jurisdictional allegations. In this situation, the "district court is to regard the [] allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceedings to one for summary judgment." *Richmond*, 945 F.2d at 768. The district court "may consider evidence by affidavit [or] depositions" in making its determinations. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982) (citing *Mims v. Kemp*, 516 F.2d 21 (4th Cir. 1975)). "Unlike the procedure in a 12(b)(6) motion where there is a presumption reserving the truth finding role to the ultimate factfinder, the court in a 12(b)(1) hearing weighs the evidence to determine its jurisdiction," unless of course the "jurisdictional facts are intertwined with the facts central to the merits of the dispute." *Id.*

### B. Fed. R. Civ. P. 12(b)(6)

To resolve Rule 12(b)(6) motions, the Court applies the familiar *Twombly*/*Iqbal* standard. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Accordingly, the Court accepts Plaintiffs' factual allegations as true and draws all reasonable inferences in their favor. *See Kensington Volunteer Fire Dep't, Inc. v. Montgomery*

*Cnty.*, 684 F.3d 462, 467 (4th Cir. 2012). The Court treats the question of whether Plaintiffs have statutory standing under RICO as a 12(b)(6) issue. *E.g.*, *Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556, 562 (6th Cir. 2013), *abrogated on other grounds by Med. Marijuana, Inc. v. Horn*, 604 U.S. 593 (2025) (explaining that civil RICO standing is different from Article III standing in that it does not implicate the court's subject matter jurisdiction); *Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.*, 884 F.3d 489, 493 (4th Cir. 2018) (treating civil RICO standing as a 12(b)(6) issue).

## II. ANALYSIS

### A. Sovereign Immunity

The Eleventh Amendment protects the states from being sued without their consent. *See Alden v. Maine*, 527 U.S. 706, 713 (1999). This is known as sovereign immunity. *See Singleton v. Md. Tech. & Dev. Corp.*, 103 F.4th 1042, 1047 (4th Cir. 2024). "When a [state] properly asserts its sovereign immunity in a suit, the federal courts lack jurisdiction to proceed any further against it."[2] *Jackson Creek Marine, LLC v. Maryland*, 153 F.4th 423, 428–29 (4th Cir. 2025). And "[t]his immunity 'also extends to state agencies and other governmental entities that can be viewed as arms of the state.'" *Doe v. Univ. of N.C. Sys.*, 133 F.4th 305, 313 (4th Cir. 2025) (quoting *Singleton*, 103 F.4th at 1047).

Because "sovereign immunity is 'akin to an affirmative defense,'" the "burden of proof falls to an entity seeking immunity as an arm of the state, even though a plaintiff generally bears

[2] Though often referred to as a jurisdictional bar, Eleventh Amendment immunity is more aptly described as "quasi-jurisdictional," falling somewhere between a jurisdictional limit and an affirmative defense. *E.g.*, *Sato v. Orange Cnty. Dep't of Ed.*, 861 F.3d 923, 927 n.2 (9th Cir. 2017). It is jurisdictional in the sense that it is a constraint on federal judicial power, but unlike a true jurisdictional rule, sovereign immunity is waivable and does not attach if and until the state raises it. *See Wis. Dep't of Corrections v. Schacht*, 524 U.S. 381, 382 (1998).

the burden to prove subject matter jurisdiction." *Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 176 (4th Cir. 2019) (quoting *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014)). The arm-of-the-state inquiry is "'a question of federal law' that 'can be answered only after considering the provisions of state law that define the agency's character.'" *Galette v. N.J. Transit Corp.*, 607 U.S. 509, 519 (2026) (quoting *Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 429 n.5 (1997)); *see also Jackson Creek Marine*, 153 F.4th at 433 (characterizing inquiry as "more art than science").

For several decades, the Fourth Circuit has relied on a non-exhaustive, four-factor test for deciding whether an entity is an arm of the state:

> (1) Whether any judgment against the entity will be paid by the State;
>
> (2) The degree of autonomy exercised by the entity, including such circumstances as who appoints the entity's directors or officers, who funds the entity, and whether the State retains a veto over the entity's actions;
>
> (3) Whether the entity is involved with state concerns as distinct from non-state concerns, including local concerns; and
>
> (4) How the entity is treated under state law, such as whether the entity's relationship with the State is sufficiently close to make [it] an arm of the State.

*Singleton v. Md. Tech. & Dev. Corp.*, 103 F.4th 1042, 1048 (4th Cir. 2024); *accord Ram Ditta ex rel. Ram Ditta v. Md. Nat'l Cap. Park & Plan. Comm'n*, 822 F.2d 456 (4th Cir. 1987). In 2026, the Supreme Court refined the arm-of-the-state inquiry to focus on three primary factors: "(1) whether the State intended to create a legally independent entity, which is shown by the entity's form and treatment under state law; (2) whether the State is formally liable for the entity's debts or liabilities, including judgments; and (3) the degree of control the State exercises over the entity." *Nilsen v. Univ. of Washington*, 186 F.4th 1133, 1138 (9th Cir. 2026) (citing *Galette*, 607 U.S. at 523–27). While *Galette* places greater emphasis on an entity's corporate form and who is *formally*

responsible for the entity's debts, the Fourth Circuit's *Ram Ditta* factors are not inconsistent with the *Galette* factors. *See Williams v. Charleston Cnty. Sheriff's Off.*, 2026 WL 2043182, at *1–2 (4th Cir. July 15, 2026).

Here, UVA asserts immunity, claiming to be an arm of the Commonwealth of Virginia. Dkts. 158, 159. UVA's assertion is unsurprising, given that courts, to date, have uniformly held that Virginia's public universities are immune from suit.[3] This includes one Fourth Circuit decision that held that Radford University—a public university like UVA—is entitled to sovereign immunity. *See infra* Section III(A)(iv) (discussing *Richard Anderson Photography*, 852 F.2d at 115).

In the face of this contrary authority, Plaintiffs argue that *Galette* significantly altered the arm-of-the state inquiry, requiring a wholesale rethinking of UVA's immunity. *See* Dkt. 174 at 4–20 (discussing *Galette*, 607 U.S. at 523–27). Specifically, Plaintiffs argue that *Galette*'s newfound focus on an entity's corporate form and "formal" liability for judgments compels the conclusion that UVA is not an arm of the state. *Id.* According to Plaintiffs, UVA, which is indisputably a distinct corporation, is legally independent of the Commonwealth and there is no law or regulation compelling the Commonwealth to pay for judgments against UVA. *Id.*

---

[3] *See, e.g.*, *Richard Anderson Photography v. Brown*, 852 F.2d 114, 115 (4th Cir. 1988); *Doe v. Va. Polytechnic Inst. & State Univ. ("Va. Tech.")*, 2020 WL 1309461, at *4 (W.D. Va. Mar. 19, 2020); *Yunsong Zhao v. Va. Tech.*, 2018 WL 5018487, at *4 (W.D. Va. Oct. 15, 2018); *Va. Tech. v. Hokie Real Est., Inc.*, 813 F. Supp. 2d 745, 750 (W.D. Va. 2011); *Faxon v. UVA Health Sys.*, 2011 WL 841279, at *1 (W.D. Va. Mar. 7, 2011); *Huang v. UVA*, 2011 WL 6329755 (W.D. Va. Dec. 19, 2011); *Keitz v. Unnamed Sponsors of Cocaine Rsch. Study*, 829 F. Supp. 2d 374, 380 (W.D. Va. 2011); *Collin v. UVA*, 873 F. Supp. 1008 (W.D. Va. 2005); *UVA v. Carter*, 267 Va. 242, 244 (Va. 2004); *Tigrett v. UVA*, 97 F.Supp.2d 752, 756 (W.D.Va.2000); *Carboni v. Meldrum*, 949 F.Supp. 427, 433 (W.D. Va.1996); *Richard Anderson Photography v. Radford Univ.*, 633 F. Supp. 1154 (W.D. Va. 1986); *Hall v. Roberts*, 548 F. Supp. 498, 501 (W.D. Va. 1982); *James v. Jane*, 221 Va. 43, 51, 282 S.E.2d 864, 868 (Va. 1980); *Lawhorne v. Harlan*, 214 Va. 405, 405 (Va. 1973).

UVA disagrees, arguing it is and has always been an arm of the state and that *Galette* does nothing to alter this well-accepted fact. *E.g.*, Dkt. 185 at 2–17. UVA cites to a centuries-old precedent for the prospect that it has always been controlled by and dependent upon the Commonwealth. *Id.* at 16 (quoting *Phillips v. Rector & Visitors of Univ. of Va.*, 34 S.E. 66, 67 (Va. 1899) ("The university, from its foundation, has been wholly governed, managed, and controlled by the state. . . .")). It further cites to Virginia statutes which, it believes, show its legal dependence on the Commonwealth. *E.g.*, *id.* at 12 (citing Va. Code § 23.1-2200(A)). And finally, it provides declarations from Jonathan Roth, the Assistant Director of Risk Management for Virginia; Michael Maul, Director of Virginia's Department of Planning and Budget; Sharon Lawrence, Virginia State Comptroller and Director of Virginia's Department of Accounts; and Leigh Maurelli, Chief Financial Officer of UVA. Dkts. 159-1–159-4. These declarants explain UVA's participation in the state's voluntary Risk Management Plan and assert that most judgments against UVA are paid using state funds from that program. *Id.* They also assert that any judgments against UVA that are not covered by the Risk Management Plan would be paid using state funds specially appropriated by the General Assembly. *Id.*

Having recited the basic contours of the parties' arguments and the legal framework governing the arm-of-the-state analysis, the Court will now focus on how the three *Galette* factors apply to UVA.[4]

[4] The Court applies the *Galette* factors—as opposed to the *Ram Ditta* factors—because that is how the parties framed the arm-of-the-state issue in their briefing. However, regardless of whether the Court applies the Supreme Court's refined three factor test or the Fourth Circuit's traditional four-factor test, the same conclusion should be reached. {"Is/would be" or "should be" reached"?}

**1. UVA has a separate corporate form**

At first glance, *Galette*'s "corporate form" factor cuts against UVA being immune. Unlike the University of Washington—which was the subject of the Ninth Circuit's decision in *Nilsen*—UVA has a separate corporate identity from the Commonwealth. *See, e.g.*, Dkt. 174-1 at 304 (describing UVA as a "component unit" which is "legally separate from the Commonwealth of Virginia."). But the first *Galette* factor is slightly more complicated than just ascertaining corporate form. In addition to corporate form, that factor requires courts to consider the entity's "treatment under state law." *Nilsen*, 186 F.4th at 1138 (citing *Galette*, 607 U.S. at 523–27). This includes whether state law empowers the entity to "sue and be sued, hold property, make contracts, and incur debt." *Galette*, 607 U.S. at 524 (citations omitted). After all, the "ultimate question remains whether the State structured the entity as part of itself or as legally independent." *Id.* at 525.

On this question, Virginia law is a mixed bag—some statutes suggest UVA's legal independence while others suggest otherwise. For example, Virginia law provides that UVA's board is not fully independent but "shall at all times be under the control of the General Assembly." Va. Code § 231.-2200(A). Moreover, UVA's real property "is the property of the Commonwealth."[5] *Id.* § 23.1-1310. And while UVA's Board may sue and be sued, that litigation is controlled by the Attorney General of Virginia—who also hires and supervises UVA's general counsel. *See id.* § 2.2-507. These provisions indicate a degree of dependence on the Commonwealth.

By contrast, Virginia law vests UVA with "all the corporate powers given to corporations by the provisions of Title 13.1," *id.* § 23.1-2200, and grants sweeping managerial powers to the

[5] The Commonwealth's control over UVA's real property is further confirmed by the statute prohibiting UVA's Board from encumbering UVA's real property without first obtaining the consent of the General Assembly. *Id.* § 23.1-2205.

Board, *id.* §§ 23.1-2208–2210. These powers include managing UVA's $15.5 billion endowment, *id.* § 23.1-2210,[6] and making contracts and incurring debt, *id.* § 23.1-1008(1). These provisions indicate a degree of independence.

Applying *Galette*'s first factor to UVA isn't easy. UVA is clearly a distinct corporation with a high degree of autonomy over day-to-day management of the University and its associated entities. However, the Commonwealth also withheld important corporate powers from UVA and its Board including the power to encumber UVA's real property. Adding to the fray, the Supreme Court of Virginia, which has final say on Virginia law,[7] has explained that many state agencies have separate corporate forms but remain arms of the Commonwealth. *UVA v. Carter*, 267 Va. 242, 245(Va. 2004). The Supreme Court of Virginia has also consistently viewed UVA as an arm of the Commonwealth. *See Phillips*, 97 Va. at 476; *Cuccinelli v. UVA*, 283 Va. 420, 427 (Va. 2012).

According full respect to the Supreme Court of Virginia (which has never fully analyzed the question of UVA's legal independence, and certainly has not done so post-*Galette*), the statutory scheme governing UVA paints a picture of an entity that is more independent than dependent.[8]

6 S*ee also Annual Report 2025 Highlights*, Univ. of Va. Inv. Mgmt. Co., https://uvimco.org/wp-content/uploads/2025/09/UVIMCOAnnualReport2025Highlights.pdf

7 Because the arm-of-the-state inquiry is ultimately "a question of federal law," the Supreme Court of Virginia's interpretation of "the provisions of state law that define the [UVA's] character" is relevant but not controlling. *Galette*, 607 U.S. at 519 (quotation omitted); *accord Ram Ditta*, 822 F.2d at 459–60; *Christy v. Pa. Tpk. Comm'n*, 54 F.3d 1140, 1149 n.9 (3d Cir. 1995).

8 Citing Va. Code § 23.1-1006(G), UVA argues that the General Assembly recently reaffirmed that UVA is entitled to sovereign immunity. Dkt. 185 at 14. But UVA overstates what the General Assembly said in § 23.1-1006(G). The legislature did not say that UVA and its sister public universities are entitled to sovereign immunity. It said that UVA and its sister public universities are "entitled to the same sovereign immunity to which they would be entitled if the" the Generally Assembly had not passed the Restructured Higher Education Financial and Administrative Operations Act.

Given its separate corporate form, its ability to sue and be sued, its ability to contract and incur debt, and its ability to manage its day-to-day operations (including controlling billions of dollars in University assets), it is difficult to say that UVA is indistinct from the Commonwealth. But this is a close call because UVA falls somewhere between the New Jersey Transit Company, which *Galette* held was legally independent from New Jersey, and the University of Washington, which *Nilsen* held was an arm-of-the-state.[9] Ultimately, though, the first factor cuts against immunity.

**2. Commonwealth is not formally liable for judgments against UVA**

Turning from corporate form, *Galette* instructs courts to also consider whether the entity or the state is liable for judgments against the entity. 607 U.S. at 525. UVA argues that the Commonwealth is formally liable for any judgments against it because: (1) the Commonwealth owns UVA's real property, and (2) UVA participates in a state-run self-insurance program that covers judgments from state funds. Dkt. 159 at 6–10. It also argues that *Galette* is distinguishable because unlike New Jersey, which specifically disclaimed liability for judgments against the New Jersey Transit Corporation, Virginia has not formally disclaimed liability associated with UVA. *Id.* The next logical step in UVA's argument is that, because Virginia has not renounced liability for UVA's debts, the state remains formally liable. *Id.*

In further support of this argument, UVA's declarants opine that: (1) judgments against UVA are paid out of the Public Liability Risk Management Plan; and (2) if any judgment exceeds the Risk Management Plan's per-occurrence payout cap or falls outside the scope of its coverage, the General Assembly would appropriate funds to satisfy UVA's debt. Dkts. 159-1–159-5. But

[9] The University of Washington is "not a corporation under state law" and "lacks the express power to sue and be sued," but it does have other "traditional corporate powers" like being able to dispose of its property, enter into contracts, and incur debt. *Nilsen*, 186 F.4th at 1140. Moreover, the Washington State Legislature passed several statutes indicating its intent that the University of Washington be treated as an arm of the state. *Id.*

despite a lot of discussion about history, tradition, and practice, none of the declarants cite a single statute *requiring* the Commonwealth to satisfy UVA's debts. And none of the declarations provide a single concrete, historical example where the Commonwealth specifically appropriated funds to cover a judgment against UVA or any other public university. Instead, they rely on UVA's voluntary forty-year involvement with the Risk Management Plan.

*Galette* makes clear that the important inquiry is not whether the state *would likely satisfy* judgments against an entity but whether state law "*require[s]*" that result. *Galette*, 607 U.S. at 534 (emphasis added). A state "cannot imbue an entity with its immunity simply by agreeing to 'pick up the tab.'" *Id.* at 525 (quoting *Lewis v. Clark*, 581 U.S. 155, 165 (2017)). UVA's participation in the Risk Management Plan—a voluntary self-insurance program, *see* Va. Code § 23.1-1008—would not oblige the Commonwealth to pay UVA's judgments if: (1) UVA opted out of the Risk Management Plan,[10] or (2) a specific judgment exceeded the terms of the Plan. Moreover, UVA's declarants assert—without any citation to law or regulation—that judgment creditors could not reach UVA's $15.5 billion endowment or billions of dollars in healthcare-related revenue and that any judgment would therefore have to be paid by appropriation from the General Assembly or by lien on UVA's real property. Dkts. 159-1–159-5. But bald assertions are not enough to meet UVA's burden to establish its entitlement to immunity. *See Williams*, 929 F.3d at 176 (burden is on the entity asserting immunity). This is especially so because, absent a statute shifting responsibility for UVA's debts to the Commonwealth, UVA's existence as a separate corporation suggests that it—like all other corporations under common law—is responsible for its own debts. *Cf. Bank of the U.S. v. Planters' Bank of Ga.*, 22 U.S. (9 Wheat.) 904, 907 (1824) ("The suit is against a

[10] UVA's own declarations make clear that it voluntarily pays premiums to participate in the Plan, and that it could decide not to do so in the future. *E.g.*, Dkt. 159-1 ¶ 11.

corporation, and the judgment is to be satisfied by the property of the corporation, not by that of the individual corporators. The State does not, by becoming a corporator, identify itself with the corporation.”).

The Court sees nothing in Virginia law—beyond practice and custom—that would *compel* the General Assembly to pay UVA’s debts, and there seems to be nothing stopping a judgment creditor from reaching UVA’s considerable resources if the Commonwealth refused to pay.[11] If, of course, a party sued UVA and attempted to enforce a judgment against state property or funds, the Commonwealth could invoke its necessary party status and assert its own immunity at that time.[12] *Hopkins v. Clemson Agric. Coll.*, 221 U.S. 636, 648–49 (1911). But like Clemson University in *Hopkins*, there is nothing suggesting that UVA cannot be sued in its own name and satisfy its own judgments. *Id.* at 648. Because *Galette*’s second factor focuses on formal liability rather than

[11] The declarants basically describe an accounting shell game where UVA’s revenues are technically accounted for by the Treasury, but UVA retains the power to spend its revenue as it sees fit. Dkts. 159-3 ¶¶ 15–17; 19; 159-4 ¶¶ 9–11, 14, 24. Specifically, Ms. Lawrence confirms that under the University’s “sum-sufficient appropriation authority,” UVA can spend tuition and fees, research and sponsored program funds, auxiliary enterprise funds, and patient-care revenues as it sees fit with little oversight from the Commonwealth. Dkt. 159-3 ¶¶ 15–17. Presumably it could spend those revenues covering judgments. Regardless, even if the Commonwealth “technically” appropriates funds to UVA, that fact carries little weight in the arm-of-the-state analysis because states routinely provide financial support to agencies that are not arms of the state. *See Galette*, 607 U.S. at 525–26 (2026) (“[A] State’s history of subsidizing an entity carries little weight. State governments routinely fund nonprofits, private corporations, and municipalities, but the receipt of those state funds does not mean that those entities become part of the State itself, even when the funding is a “significant amount.”).

[12] In *Hopkins*, the Supreme Court reversed the state supreme court’s decision that Clemson University (then Clemson Agricultural College) was an arm of South Carolina, noting that Clemson could sue and be sued in its corporate name. 221 U.S. at 646. However, the Court noted that where the desired remedy affected state property, the state would become a necessary party—*i.e.*, the real party in interest—and the state could invoke its sovereign immunity. *Id.* at 648–49. That is why the Supreme Court remanded the case to the state court to determine whether Mr. Hopkins’s requested injunction would affect an embankment owned by South Carolina (but located on Clemon’s campus).

voluntary liability (or even common practice), and because there is no evidence that Virginia is formally liable for UVA's debts, this factor also weighs against UVA's asserted immunity.

### 3. Commonwealth exercises some control over UVA, but not unlike the control New Jersey exercised over the New Jersey Transit Corporation

*Galette*'s third factor addresses the state's control over the entity. 607 U.S. at 526. But as the Supreme Court noted, control "is not especially probative because 'ultimate control of every state-created entity resides with the State' even those that are not arms of the State." *Galette*, 607 U.S. at 526 (quoting *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 47 (1994)). Despite separation between the state and an entity, the state might still "exercise [some] control through various formal and informal levers, from appointing and removing officers, to directing projects or vetoing actions, [and] to monitoring day-to-day operations." *Id.*

The most obvious degree of control the Commonwealth exercises over UVA is retaining ownership over its real property. *See* Va. Code § 23.1-1310. This is different from the New Jersey Transit Company, which owns property independently. *Galette*, 607 U.S. at 530. Another obvious degree of control is that the Governor appoints the members of UVA's Board. *See* Va. Code § 23.1-1300. But this is not unlike the New Jersey Transit Corporation, which has a board comprised of "three ex officio members from the Governor's cabinet, six members appointed with the advice and consent of the Senate, and two members appointed on the recommendation of the President of the Senate and Speaker of the General Assembly." *Galette*, 607 U.S. at 516. But the composition of NJ Transit's board with state-appointed individuals did not prevent the Supreme Court from concluding that it was a non-state entity. *Id.* at 536. Therefore, state appointment of UVA's board appears to be one of those "formal . . . levers" of state power that might not indicate real control. *Id.* at 526.

UVA's Board also appoints a President, but it delegates day-to-day management of the entity to that officer. Va. Code § 23.1-2209 ("The board shall grant to the president of the University supreme administrative direction over all the schools, colleges, divisions, and branches of the University."). Moreover, in 2016, the Commonwealth ceded even more management authority to public universities by allowing them to negotiate "management agreements" that, under certain circumstances, can supplant contradictory provisions of state law. Va. Code § 23.1-1006(A)–(E); *see also* Dkt. 174-5 (Management Agreement between Virginia and UVA). UVA's management agreement with the Commonwealth reveals that UVA is functionally autonomous, and that the only check on UVA's power to self-govern is the Governor's right to terminate the agreement for "substantial non-compliance." Dkt. 174-5 at 9 (Section 3.2.1).

Thus, while gauging a state's control over an entity is an "uncertain and unreliable exercise," *Galette*, 607 U.S. at 526 (quotation omitted), UVA clearly falls on the side of control that suggests near complete independence from the state.

**4. Binding Fourth Circuit precedent compels the conclusion that UVA is immune**

Although the Court's application of the three *Galette* factors strongly suggests that UVA is not an arm of the state under the Supreme Court's refined test, the Court is not writing on a clean slate. Applying its traditional four-factor arm-of-the-state test, the Fourth Circuit has previously concluded that Radford University is an arm of the state, *Richard Anderson Photography*, 852 F.2d at 115,[13] and that the University System of Maryland (which is similar to the public university system in Virginia) is also an arm of the state, *Maryland Stadium Authority v. Ellerbe Becket Inc.*,

---

13 In the thorough and well-reasoned district court opinion underlying the Fourth Circuit's decision, Judge Kiser engaged in what was essentially a *Galette* analysis several decades before that decision was handed down by the Supreme Court. *See Richard Anderson Photography*, 633 F. Supp. at 1154.

407 F.3d 255, 257 (4th Cir. 2005). Neither *Richard Anderson* nor *Maryland Stadium Authority* were implicitly or explicitly overruled by *Galette*. Rather, as noted above, the Fourth Circuit recently confirmed that it will continue to use its four-factor arm-of-the state test even after *Galette*. *See Williams*, 2026 WL 2043182, at *2. Therefore, this Court must "mechanically" apply *Richard Anderson*'s holding that Virginia's public universities are immune from suit.[14] *Id.*; *see also Richard Anderson Photography*, 852 F.2d at 115 ("We affirm the dismissals on eleventh amendment grounds as to [Radford University] and its board and the official in her official capacity").

Given this, *Richard Anderson* and *Maryland Stadium Authority* compel the conclusion that, like Radford and the University of Maryland, UVA is an arm of the state that is immune from suit. To the extent the Fourth Circuit wants to reorder the legal position of Virginia's universities post-*Galette*, it must do so in the first instance.[15] This Court cannot overrule prior decisions of the Fourth Circuit, and especially not when that higher court recently reaffirmed the viability of its traditional arm-of-the-state analysis. *See Williams*, 2026 WL 2043182, at *2.

Therefore, based on current binding precedent, the Court lacks jurisdiction over UVA and must dismiss all claims against it.

---

[14] District courts are not free to overrule the decisions of higher courts, even when the continued viability of that precedent may be called into question. *See United States v. Ruhe*, 191 F.3d 376, 388 (4th Cir. 1999) (setting out general rule that a "simple panel" is bound by prior Fourth Circuit precedent "absent contrary law from an en banc or Supreme Court decision"); *see also Payne v. Taslimi*, 998 F.3d 648, 654 & n.2 (4th Cir. 2021) (describing the duty to follow prior circuit precedent as "mechanical mandate").

[15] The General Assembly could also pass legislation clarifying the status of Virginia's public universities. *See Galette*, 607 U.S. at 536 (2026) ("To the extent New Jersey, and other States, created such corporate entities intending that they would remain part of the State and that the State would formally assume their liabilities, the States are always free to amend their laws.").

**B. RICO**

Defendants move to dismiss Plaintiffs' RICO and RICO conspiracy claims for the second time. Dkts. 154, 156, 158, 160, 163. Because Plaintiffs have still failed to allege any harm directly caused by a pattern of racketeering activity, they do not have statutory standing to assert their RICO claims against the non-UVA Defendants.

**1. Statutory Standing under RICO**

A civil RICO claim has four essential elements: "(1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity." *FX Aviation Cap. LLC v. Guerrero*, 2025 WL 521303, at *7 (4th Cir. Feb. 18, 2025) (citing *Whitney, Bradley & Brown, Inc. v. Kammermann*, 436 F. App'x 257, 258 (4th Cir. 2011)). But to have standing to assert a civil RICO claim, a party's property or business must have been injured and that injury must be proximately caused by an act of racketeering.[16] *Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.*, 884 F.3d 489, 493 (4th Cir. 2018); *see also Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006); *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 265–66 (1992); *Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983). "Proximately caused" means a "direct relationship" between the injury and the racketeering activity. *Med. Marijuana, Inc. v. Horn*, 604 U.S. 593, 612 (2025) (RICO demands "some direct relation between the injury asserted and the injurious conduct

---

[16] 18 U.S.C. § 1964(c), which establishes the civil remedy for a RICO violation, provides:

> Any person injured *in his business or property by reason of a violation of section 1962 of this chapter* may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.

Emphasis added.

alleged." (quotation omitted)). This requires "a proximity of statutory violation and injury such that the injury is sequentially the direct result—generally at 'the first step' in the chain of causation." *Slay's Restoration*, 884 F.3d at 494 (quoting *Assoc. Gen. Contractors of Cal.*, 459 U.S. at 534).

Here, Plaintiffs allege they were demoted and, in some cases, constructively terminated. *See generally* Dkt. 150. However, "termination of employment is not, as a matter of law, a racketeering act."[17] *Zahler v. Jackson Lewis P.C.*, 2026 WL 391921, at *3 (E.D. Pa. Feb. 11, 2026). For an overt act to qualify as an "act of racketeering or otherwise wrongful under RICO, that act must be independently wrongful under some substantive provision of the RICO statute." *Johnson v. Hoffa*, 196 F. App'x 88, 90 (3d Cir. 2006). And an allegation that a plaintiff is injured "merely by a non-racketeering act in furtherance of a broader RICO conspiracy is insufficient to confer standing." *Id.* (quotation omitted).

The Supreme Court made that clear in a factually apposite case—*Beck v. Prupis*, 529 U.S. 494 (2000). In that case, the Supreme Court held that an employee who was fired for refusing to participate in a RICO enterprise and for threatening to report RICO activities did not have standing to sue under RICO because the overt act—*i.e.*, termination of employment—was not an act of racketeering. *See id.* at 507 ("[A] person may not bring suit under § 1964(c) predicated on a violation of § 1962(d) for injuries caused by an overt act that is not an act of racketeering or

---

[17] *See also Arroyo v. Oprona, Inc.*, 736 F. App'x 427, 429 (5th Cir. 2018); *Bowman v. Western Auto Supply Co.*, 985 F.2d 383 (8th Cir. 1993); *Miranda v. Ponce Fed. Bank*, 948 F.2d 41 (1st Cir. 1991); *Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 294-95 (9th Cir. 1990); *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21 (2d Cir. 1990); *O'Malley v. O'Neill*, 887 F.2d 1557 (11th Cir. 1987); *Mariani v. Nocco*, 2022 WL 912093, at *5 (M.D. Fla. Mar. 29, 2022); *Masin v. Vistakon Pharms., LLC*, 2010 WL 11594971, at *3 (D. Nev. June 14, 2010); *Zhu v. Fed. Hous. Fin. Bd.*, 389 F. Supp. 2d 1253, 1274 (D. Kan. 2005); *McFarland v. Bryan Cave LLP*, 2004 WL 7339974, at *3 (S.D. Ill. Sept. 21, 2004).

otherwise unlawful under the statute."); *see also DiGiglio v. U.S. Xpress, Inc.*, 293 F. Supp. 3d 522, 526 (E.D. Pa. 2018) ("[A] plaintiff fired for complaining about or reporting allegedly illegal acts cannot bring a RICO claim; the plaintiff must be a direct victim of an act of racketeering."). Put simply, termination of employment is not a racketeering act, and any harm deriving from said termination does not confer standing under RICO.

As already discussed, Drs. Young, Yount, Roeser, and Kern allege that they stood up to the Medical Leaders for instituting policies that fraudulently inflated procedure costs and criticized the Medical Leaders' practice of hiring and retaining incompetent physicians who placed patients at serious risk of injury or death. *See* Dkt. 80 ¶¶ 153, 225–229, 257–274, 277–305, 307–322, 325–354. The Medical Leaders then allegedly threatened Plaintiffs with professional harm if they did not participate in the fraudulent billing scheme or at least remain silent. *Id.* And because Plaintiffs did not stay silent, they allege that they suffered professional and economic harm at the hands of the Medical Leaders.

To reframe this professional harm as one or more RICO predicates, the Second Amended Complaint more conspicuously labels the Medical Leaders' actions as extortion and witness tampering.[18] Dkt. 150 at 47–52; Dkt. 176 at 2–11. The Second Amended Complaint, however, does not alter the causal structure. Just like in the First Amended Complaint, the Second Amended Complaint alleges that the Medical Leaders conspired to inflate billing; that the Medical Leaders

[18] Plaintiffs made this argument before, Dkt. 110 at 106, and the Court already rejected it, Dkt. 148. So by advancing it again, Plaintiffs are essentially seeking reconsideration of the Court's prior decision. *See* Fed. R. Civ. P. 59(e). But reconsideration is only appropriate on three narrow grounds: "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Hutchinson v. Staton*, 994 F.2d 1076, 1081 (4th Cir. 1993). Here, Plaintiffs have not demonstrated an intervening change in law, nor have they produced new evidence or shown that the Court clearly erred. Their failure to meet the reconsideration standard is a sufficient reason to reject their attempt to revive their RICO claims in the Second Amended Complaint.

threatened front-line physicians with professional harm to enforce their new billing scheme; and the Medical Leaders made good on those threats when front-line physicians opposed their upcoding scheme. But Plaintiffs' professional injuries are not a *direct* result of the racketeering scheme to inflate patients' bills. *See Slay's Restoration*, 884 F.3d at 494. In fact, no professional harm would have naturally flown from the unlawful billing scheme if the front-line doctors had simply up-coded as requested. Stated differently, Plaintiffs were not harmed because they were direct targets of the racketeering activities; they were harmed because they refused to go along with the scheme. In this regard, Plaintiffs are not materially different from Robert Beck, who lost his job as the CEO of Southeastern Insurance Group because he refused to go along with his colleagues' racketeering scheme. *Beck*, 529 U.S. at 498; *see also Mack v. Parker Jewish Inst. for Health Care & Rehab.*, 2014 WL 5529746, at *7 (E.D.N.Y. Oct. 30, 2014) (holding that a pharmacist lacked RICO standing to sue former employer and colleagues for being fired after challenging Medicare fraud); *Kachavos v. Ewing*, 2007 WL 9723226, at *9 (C.D. Cal. Mar. 28, 2007), *aff'd*, 321 F. App'x 548 (9th Cir. 2009).

Further support for this conclusion is found in *Flinders v. Datasec Corp.*, which is legally and factually analogous. 742 F. Supp. 929 (E.D. Va. 1990). In *Flinders*, Datasec employees paid kickbacks to Paradyne employees to steer Paradyne contracts to Datasec. *Id.* at 931. Richard Flinders, who served as Vice President of Sales for Datasec, learned about the illegal kickback scheme and reported it up his chain of command. *Id.* He told his superiors he "would not participate in the scheme," and because of his refusal to "play ball" he was demoted, his compensation was materially altered, and he was ultimately fired. *Id.* He sued his former employer and colleagues alleging civil RICO and conspiracy to commit RICO, and the defendants moved to dismiss. *Id.* at 932. Judge Ellis granted defendants' motion, finding that Flinders was not the "target" of the

kickback scheme because Datasec's competitors and Paradyne were the direct targets. *Id.* He concluded that "the firing was not proximately caused by the [the mail and wire fraud associated with the kickback scheme]; instead, it was an incidental result of circumstances surrounding those acts." *Id.* In other words, "the scope of the risk created by the RICO scheme was harm to Datasec's competitors and perhaps to Paradyne, but not the loss of plaintiff's job." *Id.* Ultimately, the harm to Flinders resulted from his "refusal to participate" in the RICO scheme, not from the predicate acts of racketeering. The same is true for Plaintiffs: Their injuries were merely "incidental" to the RICO scheme. *Id.*

But even if Plaintiffs could allege direct harm that was one-step away from the racketeering activity, they have not alleged sufficient facts to establish the predicate acts of extortion or witness tampering. While racketeering activity includes "an act or threat involving . . . extortion . . . which is chargeable under State law," 18 U.S.C. § 1961(1), the state law offense must include "conduct [that is] capable of being generically classified as extortionate," which is a question of federal law. *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 409 (2003). Under federal law, generic extortion is defined as "obtaining something of value from another with his consent induced by the wrongful use of force, fear, or threats." *Id.* (quoting *United States v. Nardello*, 393 U.S. 286, 290 (1969)). The First Circuit has likened the generic definition of extortion to the Hobbs Act's definition, which is: "obtaining [] property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." *United States v. Munoz-Martinez*, 79 F.4th 44, 53 (1st Cir. 2023) (marks omitted) (quoting 18 U.S.C. § 1951(b)(2)). The Federal law definition of extortion further requires that "the victim part with his property, and that the extortionist gain possession of it" or, at the very least, the extortioner intend

to part the victim with his property. *United States v. Kirsch*, 903 F.3d 213, 226 (2d Cir. 2018) (citing *Sekhar v. United States*, 570 U.S. 729, 734 (2013) and *Scheidler*, 537 U.S. at 410).

Here, the Medical Leaders demanded compliance from Plaintiffs—*i.e.*, participate in the alleged RICO scheme or lose professional opportunities. But the Medical Leaders did not attempt to part Plaintiffs with their property, and Plaintiffs' acquiescence in the alleged RICO scheme had no independent value to the conspirators. While the Medical Leaders may have calculated it was more convenient to coerce existing doctors into participating in the alleged RICO scheme, the Medical Leaders derived no economic benefit from said coercion. After all, when doctors like Plaintiffs refused to play ball, the Medical Leaders simply replaced them with doctors who would. So while the Medical Leaders' conduct may have been coercive, it was not extortionate. *See Scheidler*, 537 U.S. at 405 (describing how federal law jealously guards the distinction between coercion and extortion). Because Plaintiffs cannot satisfy federal law's generic definition of "extortion," there is no need to consider whether they have pled the elements of extortion under Virginia law. Any claim relying on extortion—based on these facts—fails.

The same is true for the alleged witness tampering. Dkt. 150 at 49–52. Section 1512(b) prohibits a person from knowingly using or attempting to use intimidation, threats, corrupt persuasion, or misleading conduct, with the intent to influence, delay, or prevent another person's testimony in an official proceeding or from speaking to law enforcement or judges; to prevent that person from participating in various ways in an official proceeding; or to cause that person to destroy materials or objects for use in an official proceeding. 18 U.S.C. §§ 1512(b)(1)–(3). But Plaintiffs' own allegations demonstrate how untethered their factual allegations are to the elements of witness tampering. The Medical Leaders wanted the doctors to participate in their alleged scheme, but they did not threaten or coerce the doctors out of fear that the doctors would reveal

the scheme to law enforcement. In fact, if the Medical Leaders had any concern about being reported to law enforcement, they probably would have stopped conveying damaging information to Plaintiffs, who were the leaders of the resistance. Because Plaintiffs have not alleged the Medical Leaders intended to "prevent communication" with a law enforcement officer, they cannot establish the RICO predicate of witness tampering. *See United States v. Ritter*, 167 F.4th 677, 685 (4th Cir. 2026).

For these reasons, Plaintiffs' RICO claims must be dismissed for the second time.

## III. CONCLUSION

For the foregoing reasons, it is hereby ordered that Defendants' motions to dismiss (Dkts. 154, 156, 158, 160, and 163) are **GRANTED**. All Counts against the UVA and the Medical Leaders and Counts I and II against UPG are **DISMISSED**.

Within 14 days of this Order, Plaintiffs shall file a third amended complaint that states *only* their False Claims Act and Virginia Fraud Against Taxpayer Act retaliation claims against UPG. UPG shall have 14 days thereafter to file its answer.

To the extent Plaintiffs wish to seek an interlocutory appeal of this Court's sovereign immunity decision as to UVA, they must file an appropriate motion within seven (7) days of this Order. If Plaintiffs file a motion seeking an interlocutory appeal, UVA shall have seven (7) days to respond.

The Clerk is directed to provide a copy of this Memorandum Opinion & Order to all parties of record.

Entered this 21st day of October, 2026.

Norman K Moon
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE